**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**William J. FRANK, Defendant–Appellant.**

**No. 93–10063.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 12, 1994.

Decided Oct. 7, 1994.

Rebecca Donaldson, San Diego, CA, for defendant-appellant.

Reese V. Bostwick and James D. Whitney, Asst. U.S. Attys., Tucson, AZ, for plaintiff-appellee.

Before: CHOY, LEAVY and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

The only significant issue in this case is whether the district judge participated in plea bargaining in such a manner as to enti-

tle the defendant to withdraw his plea. We decide that he did not.

## Facts

Frank was charged with various narcotics offenses and went to trial. On the third day of trial, April 9, 1992, the lawyers were to be in the courthouse at 8 a.m., to appear in court for any matters to be taken up before the jury came in at 8:30. When the lawyers arrived, Frank's attorney, Mr. Polis, approached the Assistant United States Attorney, Mr. Bostwick, and suggested that they discuss a plea bargain. When the clerk asked them if they had anything to take up in court before the jury came in, they told her that they were negotiating a plea agreement. The negotiations were carried on intensely in the corridor, with defense counsel for Frank and his fiancee, Virginia Berry, repeatedly consulting separately with their clients and then negotiating further with the prosecutor. Most of the negotiations had to do with what lenience could be obtained for Berry, for numerous members of Frank's family, and for Berry's father, all of whom were exposed to possible criminal prosecution. Frank had sold large quantities of marijuana for millions of dollars in Arizona and Pennsylvania.

When the clerk told the lawyers that it was time to bring the jury in, they told the clerk not to bring the jury in, because they had a deal. The clerk said they had better tell the judge, because he had said to bring in the jury. The lawyers went into chambers, and told the judge that they had worked out a plea bargain. He said that they had better tell him what it was, so that he could say whether it would be a waste of time and they should just go ahead with the trial. They told him, and he agreed to go into court immediately to put the deal on the record and assure that all parties intended the same thing, send the jury home, arrange the change of plea for the next morning, and tell the jury to be on call for the next day. The judge did not want to tell the jury that a change of plea was proposed, because that would interfere with continuation of the trial if the change of plea did not proceed as expected.

As they were leaving chambers, Mr. Polis, Frank's lawyer, asked the judge what he would have done if Frank had not made a plea agreement. The judge said that he would have sentenced Frank to life imprisonment if he could.

Then they went into court. Frank and Berry had not been in chambers, but they were in the courtroom. The prosecutor recited the terms of the agreement. Frank would plead guilty to continuing criminal enterprise, and be subject to a sentencing range of ten years to life. The judge would have discretion to set the sentence, and Frank would waive his right to appeal the sentence. Frank would also plead guilty to money laundering and tax evasion, with the judge having discretion to sentence up to the statutory maximums for those offenses. The judge would be free to depart upward from the guideline range, and Frank would not be able to appeal. If the government found additional assets which resulted from narcotics activity, it could forfeit them.

Virginia Berry would plead guilty to conspiracy. She would get a cap of five years, the statutory mandatory minimum, which would probably be below the guideline sentence. Neither side would appeal her sentence either.

The government agreed not to charge Frank's ex-wife, Elona Frank, with tax evasion for allegedly fraudulent returns she had signed, or Virginia Berry's father for harboring a fugitive. Frank's son Anthony would get house arrest with work release instead of prison, on a pending probation revocation matter. Frank could approach the government subsequently, and it would consider agreeing to a reduction of his sentence or Berry's under Federal Rule of Criminal Procedure 35, for information leading to the apprehension of two fugitive codefendants. Frank would get a downward adjustment for acceptance of responsibility if his conduct with respect to the pleading and his statements to the probation officer preparing the presentence report warranted such an adjustment.

After the agreement was set forth in open court by the prosecutor, the judge told Frank

that if he had any questions or disagreed with what the lawyers thought the agreement was, it was important for him to speak up at that time, before the jury was sent home, not the next day.

Frank asked, "Is there a cap on my sentence at all?" The judge answered, "Life." Frank asked what "life" meant. The judge answered, "Life is the rest of your days until you die." Frank replied, "Okay. Thank you." Frank asked what the guidelines were, and the judge answered that he could not make that determination at this time, and all he could assure Frank of was that the maximum to which he would be exposed would be life. Defense counsel calculated an estimated guideline range of 151 to 188 months, but the judge said he could not assure Frank that this would be the applicable range, nor could he assure Frank that the court would not depart upward from the guidelines. The judge asked Frank if he understood all that the prosecutor had said about the sentence, including the waiver of appeal and the possibility of upward departure. Frank said, "No problem."

The judge then set the change of plea for the next morning, when the written plea agreement could be filed. The written plea agreement was signed by all parties and did not differ from the oral agreement put on the record on April 9. The written agreement recited that Mr. Polis had advised Frank of the nature of the charges, and that the court could consider all the evidence from the two days of trial for purposes of a factual basis. It also recited that Frank had received at least $575,000 in 1989 for marijuana and did not file a tax return in 1990 reporting that income. Frank also agreed that he had purchased real estate with narcotics money to disguise the source of the money.

In court, the judge proceeded through the usual Rule 11 colloquy. He did not repeat the careful examination of the terms of the plea agreement which had been performed the day before, but did give Frank another chance to ask any questions he might have, and did advise him of the maximum penalties for the crimes to which he was pleading. Regarding the factual basis, the judge said that he thought the evidence had demonstrated without dispute that Frank had organized five or more people for purposes of the continuing criminal enterprise count. Mr. Polis, Frank's lawyer, said, "No dispute about that. . . . No dispute he organized at least five people, your Honor." Then the judge gave Frank an opportunity to plead, and accepted his plea of guilty.

At sentencing, Frank had a new lawyer. (The record reflects that seven different lawyers have represented him at various stages in this proceeding). The sentencing hearing was held at the same time as an evidentiary hearing on Frank's motion to withdraw his plea of guilty. His new lawyer, Ms. Thorpe, called as her first witness Mr. Polis, Frank's lawyer when he changed his plea.

Mr. Polis testified that the government's pretrial position had been a minimum of twenty years, not the ten-year minimum in the agreement, and the defense had turned it down. But after two days of increasingly damaging testimony, on his recommendation and with Frank's approval, Mr. Polis approached the prosecutor about a deal. Then, after the negotiations with the prosecutor, counsel went into chambers. Mr. Polis thought this was after the terms had been agreed upon, but he was not sure. He was sure that all the terms had been agreed upon before the judge ever addressed the defendants directly. Regarding the judge's remark about what Frank would have received if he had not made a deal, Mr. Polis said, "I solicited a remark about what would happen in the event we went to trial." Mr. Polis said that the plea was not a package deal—the government would have agreed to a change of plea by either defendant without the other. Mr. Polis had told Frank that two of his sons, the one who got house arrest, and another who was "an extremely loose cannon" and faced perjury charges, would be jeopardized if the trial continued. Frank had told Mr. Polis that he only directly supervised three people, not the five needed for a continuing criminal enterprise, but Mr. Polis explained to him that "he didn't have to directly manage people, but if he managed people who in turn managed people, that was sufficient." Mr. Polis stated: "I thought the deal was a good one and I think that he recognized that

by doing so he could save his family and save a lot of grief for—I won't say his in-laws, but all the families." Frank particularly wanted to obtain lenience for his son Anthony. He had also sought to obtain lenience for his fiancee, Virginia Berry, so that she would able to get their child back after she got out of prison. Mr. Polis had moved to withdraw as counsel because he did not feel he could properly argue for withdrawal of the same plea he had urged the court to accept.

Berry's lawyer, Mr. Tandy, testified that Mr. Polis did tell Frank, when they returned to the witness room to talk to their clients, about the judge's remark that if he went to trial and lost, the judge would sentence him to life if he could. Berry was herself facing a ten-year minimum. Mr. Tandy agreed that the terms of the agreement were final and agreed upon before the judge came into court and addressed the parties. Explaining why they were talking about the agreement in chambers, Mr. Tandy said, "The judge did not negotiate the plea for the government, but Judge Marquez said: If you guys are talking a plea, why don't you tell me what you're talking about so I can tell you whether it is either a yes or no and you can go continue on with your discussions." Mr. Tandy testified that Berry did not want her mother to get custody of her child, and did not want to do ten years. Mr. Tandy's understanding was that Frank's plea was necessary to get her out in five.

The district court denied Frank's motion to withdraw his guilty plea. The court imposed a two level upward adjustment and an additional upward departure to the extent of two levels, and denied a downward adjustment for acceptance of responsibility. The court sentenced Frank to concurrent sentences of 365 months imprisonment on the continuing criminal enterprise count, 240 months on the money laundering count, and 60 months on the tax evasion count.

## Analysis

### I. Withdrawal of the plea.

Frank argues on appeal that he should have been allowed to withdraw his guilty plea, because the judge participated in plea bargaining in violation of Federal Rule of Criminal Procedure 11(e)(1), as interpreted by *United States v. Bruce,* 976 F.2d 552 (9th Cir.1992). His argument focuses on the colloquy in open court, and on the in-chambers remark by the judge that if Frank had not agreed to plead, he would have sentenced him to life if he could.

Under Federal Rule of Criminal Procedure 11(e)(1) the court "shall not participate in any such discussions." "[S]uch discussions" refers to discussions intended to reach a plea agreement under Rule 11(e)(1). We said in *Bruce* that this rule "simply commands that the judge not participate in, and remove him or herself from, any discussion of a plea agreement that has not yet been agreed to by the parties in open court." *Bruce,* 976 F.2d at 556.

### A. The colloquy in open court.

■ Frank's appellate counsel argues that the Rule 11 colloquy in open court was participation in plea bargaining. She demonstrates that the judge did indeed discuss the plea agreement, as set out above, in open court, before Frank answered the question, "What is your plea," with the word "guilty." This discussion does literally violate the command quoted from *Bruce.* It was a discussion, and the open court agreement was not final until Frank himself said the word "guilty."

This, of course, establishes nothing except that the language of *Bruce* should not be quoted out of context. As appellant interprets *Bruce,* it would be absurd, because compliance with the nonparticipation requirement of Rule 11(e)(1) would require that the judge violate the colloquy requirements of Rule 11(c), (d), and (f). It cannot be true in all senses that Rule 11(e)(1) "simply commands that the judge not participate in, and remove him or herself from, any discussion of a plea agreement that has not yet been agreed to by the parties in open court." *Bruce,* 976 F.2d at 556. The judge has to "address the defendant personally" before accepting a guilty plea, to ascertain his understanding of the charges, the penalties, his rights, and so forth. Fed.R.Crim.P. 11(c). The judge must also "address[ ] the defen-

dant personally" before accepting his plea, to assure that the plea is voluntary. Fed. R.Crim.P. 11(d). The judge must also ascertain whether there is a factual basis for the plea. Fed.R.Crim.P. 11(f). Usually much of this discussion takes place before the defendant states that the terms of the plea agreement are consistent with his understanding and that he has received no undisclosed promises. Substantially all of it takes place before the defendant actually states that he pleads guilty. 1 Bench Book for United States District Judges § 1.06 (3d ed. 1986).

Frank's appellate counsel quotes out of context various statements made during his Rule 11 colloquy. For example, she claims that "the judge did tell Frank that he should enter the plea knowing that a life sentence could be imposed, which means 'all of your days until you die.'" She characterized the judge's conduct as "participating in the discussions advising Frank as to the course of action he should prepare for." She argues that this was just like *Bruce*, 976 F.2d at 555, where the judge advised the defendant what he should do, and then sent him home to think about it overnight.

This argument is meritless. The April 9 proceeding in open court was an appropriate and careful Rule 11 colloquy. The judge had a duty under Rule 11(c)(1) to assure that Frank knew the maximum penalties to which he exposed himself by pleading guilty. Yet his lawyer now argues that telling him those maximums, as the judge was required to do under Rule 11(c)(1), violated Rule 11(e)(1).

*Bruce* is good law, and it establishes a precedent binding in this circuit. The problem with appellant's use of it is that his attorney would have us read it as quotations in the air, instead of as a case. We judges cannot write laws, like Congress. We can only perform the humbler task of deciding particular cases before us. In order to decide them, we have to state what principles we are following, and we are obligated to follow precedent, so that we can decide like cases alike. But we cannot legislate, by announcing a principle of decision which if taken literally would nullify a law passed by Congress. The several rules quoted requiring the kind of colloquy the judge held are

such laws. All that is said in a decision, *Bruce* or this case, must be understood *"merely* as a reason for deciding *that* case *that* way." Karl N. Llewellyn, The Bramble Bush 36 (1930). This is so because "the court *can* decide only the particular dispute before it; ... all that is said is to be read with eyes on that dispute." *Id.* at 38. Frequently in explaining our decision in a case, we use words which, if quoted without regard to their purpose in the particular case would lead to a ridiculous result in other factual circumstances. For that reason, the words of a pronouncement such as the one in *Bruce* cannot be understood without reference to the factual and procedural context in which they were written.

In *Bruce,* the defendants had not agreed to the deal worked out between the lawyers. The judge was trying to talk them into it. He called one of the defendants "son" and after the defendants told the judge they did not need any more time to think about the deal, the judge nevertheless told them to take some time, emphasizing the life sentence they faced if they did not plead, compared to the 42 months if they did. The judge told them to think seriously about it overnight, and asked if they were parents. The judge said, "If it was my child, I would think carefully about it." We held that this violated the principle that before the parties have concluded a plea agreement and disclosed its terms in open court, the judge should refrain from all forms of plea discussion.

The avuncular advice in *Bruce* is distinguishable, because the purpose to which *Bruce* speaks has no application here. The purposes of Rule 11(e)(1) are to keep the judge from shaping the plea bargain or persuading the defendant to accept particular terms, and to preserve judicial impartiality. *See Bruce,* 976 F.2d at 556–57; Fed. R.Crim.P. 11 Advisory Committee Note on 1974 Amendment. The judge in the case at bar, unlike the judge in *Bruce,* was not trying to shape the agreement or persuade either side to accept it. The colloquy took place after, not before, the parties had concluded their agreement, and the prosecutor had laid it out in open court. True, the

agreement was not yet formal and binding. It was not yet in writing and the defendant had not yet said "guilty" in response to the question "what is your plea." That question and answer take place at the end of the Rule 11 colloquy, and many plea agreements are oral. The rule against judicial participation in plea bargaining protects the parties against implicit or explicit pressure to settle criminal cases on terms favored by the judge. It does not establish a series of traps for imperfectly articulated oral remarks. Such an interpretation would compel the judge to read his bench book as a script, instead of "addressing the defendant personally" as required by the other parts of the rule. The judge may have to talk to the defendant, in informal diction, to find out whether he understands the agreement, means to accept it, is fit to plead, and committed the crimes to which he proposes to plead guilty. This requires some flexibility, though it does not require or permit encouragement or threats to obtain pleas of guilty.

### B. The in-chambers remark.

■ The remark in chambers presents additional concerns. Many judges generally refrain from any in-chambers discussion of a proposed change of plea in a criminal case, lest they overstep Rule 11(e)(1). Here the judge had another concern, though, besides the plea. He had a jury waiting in the jury room. He had a duty to manage the trial. They were in the middle of it. As part of his trial management, a judge frequently must consult counsel in chambers regarding things which will affect the timing of the events at trial. The mid-trial context of the inquiry justified bringing the lawyers into chambers to find out what was going on, for trial management purposes. The judge had to determine whether to bring the jury into the courtroom and proceed with trial, discharge the jury, or send the jury home for the day but keep it on call for the next day. The judge decides, under Rule 11(e)(3) and (4), whether to accept or reject the plea agreement. The judge was not obligated to waste the trial day, or the entire portion of the trial which had already taken place, if the proposed plea bargain were one which the judge was sure he would reject.

Had the judge suggested a change of plea, and given force to his suggestion by saying that the defendant faced life if he went to a verdict and lost, but would get a lesser sentence if he pleaded guilty now, we would have a case like *Bruce*. The message would be communicated back to Frank, so keeping him out of the room would not insulate the discussion. But that is not what happened. The judge needed to know whether the plea discussions were serious enough to justify sending the jury home. He did not threaten anything if Frank did not plead, or promise anything if he did. Frank was still exposed to life, whether he took the deal or not. The deal was being set before the judge as a justification for sending the jury home instead of continuing with trial that day, not as an impasse which the judge was being invited to resolve. Nor did the judge volunteer the remark about what sentence he would have liked to impose if the law allowed. Frank's lawyer asked him. The government characterizes it as subjunctive mode, condition contrary to fact, as in, what would you have done if we had not agreed on a deal. Even if that is not so, and the deal was not final, and even if it was error for the judge to answer Mr. Polis's question, at worst it was invited error. "The doctrine of invited error prevents a defendant from complaining of an error that was his own fault." *United States v. Reyes–Alvarado*, 963 F.2d 1184, 1187 (9th Cir.1992).

Frank's argument that the plea agreement was impermissibly coercive because it was a "package deal" is meritless. Even if the deal was the type of package deal contemplated by *United States v. Caro*, 997 F.2d 657 (9th Cir.1993), all that *Caro* requires is careful scrutiny to ensure voluntariness. *Id.* at 659–60. The judge gave it just the kind of careful scrutiny he was supposed to give. The careful scrutiny is what Frank claims was undue participation in the April 9 proceeding.

Frank's remaining claims do not merit extended discussion. Negotiating the plea was not ineffective assistance of counsel, and the agreement was not unconscionable. There is nothing unusual or unconscionable about a defendant with a hopeless case giving the government an easier time of it in exchange

for lenience for other people whom the defendant cares about. Frank waived any complaints about the wording of the indictment and the information by pleading guilty. *See Cox v. United States,* 428 F.2d 877, 878 (9th Cir.1970). Frank was adequately informed of the charges against him as required by Rule 11(c). The factual basis for Frank's guilty plea, including his supervision of five or more people, was sufficiently established by the trial testimony, and by Frank's open-court statements during the Rule 11 colloquy. *United States v. Delgado,* 4 F.3d 780, 785 (9th Cir.1993).

II.  The Sentence

We do not consider Frank's challenges to the adjustment, departure, denial of adjustment, and presentence report determinations affecting Frank's sentence. He made an agreement in which he "waives any right to appeal the imposition of sentence," and he is bound by it. *United States v. Bolinger,* 940 F.2d 478, 480 (9th Cir.1991).

AFFIRMED.