**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 10, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MARCO ANTONIO CANO-
VARELA,

Defendant-Appellant.

No. 06-8020

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. NO. 04-CR-107-D)**

---

David A. Kubichek, Assistant United States Attorney (Matthew H. Mead, United States Attorney, with him on the brief) for Plaintiff-Appellee.

Jill M. Wichlens, Assistant Federal Public Defender (Raymond P. Moore, Federal Public Defender, with her on the briefs) for Defendant-Appellant.

---

Before **MURPHY**, **McWILLIAMS**, and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

Marco Antonio Cano-Varela entered a pretrial status conference disappointed with the plea deal his lawyer had helped negotiate and displeased with his lawyer's provision of Spanish-language discovery materials. He

intended to request a change of counsel so that he could go to trial on drug charges. During the conference, however, the district court informed Mr. Cano-Varela that he would potentially face a vastly longer sentence if he went to trial and was convicted than if he pleaded guilty. Two weeks later, Mr. Cano-Varela accepted the government's plea deal. We hold that the district court violated Rule 11(c)(1)(C)'s prohibition against judicial participation in plea negotiations by comparing, before Mr. Cano-Varela and the government had reached a plea agreement, the potential penal consequences of pleading guilty versus going to trial. We therefore vacate Mr. Cano-Varela's guilty plea and sentence.

**I.**

This case involves Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, a rule about which our Circuit has little precedent. We therefore recite the facts in some detail to provide district courts as much guidance as possible regarding the scope of permissible conduct under this rule.

On May 19, 2004, a forty-six-count indictment charged thirty-four people in the United States District Court for the District of Wyoming with various drug and money-laundering offenses. Mr. Cano-Varela was one of those defendants. He was named in three counts: count one, conspiracy to possess with intent to distribute 500 grams or more of methamphetamine and 100 kilograms or more of marijuana in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(A–B); count three, conspiracy to launder drug proceeds in violation of 18 U.S.C. §§

-2-

1956(a)(1)(A)(i), (a)(1)(B)(i), and 1956(h); and count six, aiding and abetting the

January 16, 2004, possession with intent to distribute more than 50 grams

methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 18

U.S.C. § 2.  When Mr. Cano-Varela was arraigned on April 8, 2005, the court

found that he was indigent and appointed counsel to represent him.

**A.    Mr. Cano-Varela's First Letter**

On October 4, 2005, Mr. Cano-Varela sent a letter to the district court

expressing concern about his relationship with his attorney.  Two fellow inmates

helped Mr. Cano-Varela write the letter.  His letter stated:

> I am writing to you in regards to my discovery.  My attorney .
> . . has told me that he cannot give me any discovery for security
> reasons.  He also faxed me a speedy trial waiver and told me to sign
> it without discussing the waiver to me.  The waiver is in English and
> I am very limited in this language.  My questions are; how can I help
> in my defense if I can not see or read any of the evidence against
> me?  Also why can't [my attorney] send any paperwork,
> correspondence, motions etc. in the language I am capable of
> reading?
>     . . . .
> Please help me.  My attorney doesn't seem to understand that I
> do not fully comprehend why I can't see evidence to help in my
> defense.

R. Vol. I, Doc. 1043.

The district court responded to this letter by holding a telephonic status

conference with the prosecutor and Mr. Cano-Varela's lawyer.  The court read the

letter into the record and asked defense counsel to address the issues Mr. Cano-

Varela raised.  Counsel responded, "[m]ost of the discovery that I actually have,

the physical discovery, I have translated to him . . . through a translator," R. Vol. III, at 4, and explained,

> the problem I think we're having, Your Honor, is that I've told him about the *Jencks*[1] material, and that is the main evidence against him; and that's, I believe, three witnesses which I do not have in my possession. I was only allowed to take notes of that information. So I've relayed that information to him and explained that I don't have that to send to him in Spanish, and he doesn't quite grasp that.

*Id.* at 5. The court asked defense counsel to try explaining the situation to Mr. Cano-Varela again, stating that "obviously we need to afford foreign nationals every bit as much of an opportunity to assess the evidence against them as we do American citizens." *Id.* Noting that the defendant was "at somewhat of a disadvantage because of his inability to speak English," *id.* at 7, the court told defense counsel:

> [I] typically get these kinds of letters more frequently from foreign nationals who just have a great distrust of the whole system. They—given their own unhappy experiences with their own legal system, they expect no better of us. So we need to do better, and I'll trust that you'll address his concerns. It's not enough that you and I understand his predicament; he has to understand it.

*Id.* at 8. After discussing other scheduling matters briefly, the court concluded the status conference by asking defense counsel to "tell your client that, in response to his letter, I had this conference with you and the United States Attorney on the record to address . . . these issues." *Id.* at 10.

---

[1]*Jencks v. United States*, 353 U.S. 657, 668–69, 672 (1957) (holding that defendants are entitled to obtain the prior statements of persons to government agents when those persons are to testify against the defendants at trial).

**B.      Mr. Cano-Varela's Second Letter**

Defense counsel's efforts following this discussion did not placate Mr.

Cano-Varela.  One month later, he sent a second letter to the district court, which

stated:

> May it come to the attention of the court that I Marco Cano
> Varela am theoroully [sic] dissatisfied with the representation
> appointed in this case therefore I'd like to dismiss said attorney:
> Because there has been no documents of this case provided to
> me, no prelim and no contact just one time that was in court to sign
> for ten years.  I'm illegal in the United States.  I want my discovery
> because I'm going to jury trial.  Also because my attorney said the
> Judge noted that I do not receive [sic] any paperwork on my case
> Judge ordered.  I've been incarcerrated [sic] for seven months and
> went to court one time.

R. Vol. I, Doc. 1049.

This letter prompted the court to hold a second telephonic status conference

just ten days before Mr. Cano-Varela's trial was set to begin.  Defense counsel

explained that during the previous week he "went physically with . . . the

translator . . . to see Mr. Cano.  We had discussed basically every piece of

evidence with him, and I went over that [evidence] specifically with him and

discussed the plea arrangement and was told . . . by him that he would accept the

plea agreement."  R. Vol. IV, at 5.  But defense counsel "did not have the written

plea agreement" when he met with Mr. Cano-Varela and "wanted to confirm with

[the prosecutor] the exact . . . elements of that plea agreement."  *Id.*  After he did

so, he passed the details to Mr. Cano-Varela who, by that time, had experienced a

change of heart. Defense counsel told the court that Mr. Cano-Varela "has informed me today that he no longer wishes to enter into the plea agreement, wants a trial and wants to fire me." *Id.* Following that explanation, the court asked:

> [I]s some jailhouse lawyer now deciding—the letter he—I got a letter from him that was written by somebody else. So who's practicing law without a license down there?
>
> DEFENSE COUNSEL:   Well, Your Honor, I think that's one of the issues, is that, you know, he's talking with people because last Friday in person we had discussed it very thoroughly, and . . . he was going to enter into the plea agreement and agreed and understood everything; and then I get a call and call him back and then used [the translator] again today, and it was a complete . . . change of mind. So—and then he wanted to fire me. So I think he's talking with people, and they might be telling him I'm not doing him a good job or something, but it seems to be a problem.
>
> PROSECUTOR:   And, Your Honor, if I could, the plea agreement itself is, I think, a real reasonable one, and so I suspect you're right. I—I think there's folks talking to him in jail that have changed his mind and persuaded him . . . to think otherwise about it, I suspect . . . .

*Id.* at 6–7. The court then scheduled an in-court status conference to discuss Mr. Cano-Varela's concerns with him in person. With that date set, the court asked:

> THE COURT:      What—what kind of—if you don't mind telling me, what kind of deal have you worked out with the government?
>
> DEFENSE COUNSEL:   Basically I believe he would end up at a Level 27 or so—
>
> THE COURT:      What—

DEFENSE COUNSEL: —and he's been informed that if he proceeds with trial, it could be, you know, double that time or more. So—

THE COURT: What's his criminal history category?

DEFENSE COUNSEL: Should be "I." He should be . . . safety-valve eligible.

PROSECUTOR: He's a Mexican national, Your Honor. So—but we don't—I think that's right. His criminal history appears to be a "I" or in the "zero-to-one points" category.

THE COURT: Well, most of these young kids from Mexico are so jaded by their own experiences with law enforcement down there, they trust no one.

PROSECUTOR: Right.

DEFENSE COUNSEL: Yeah. I think that's, you know, one of the main problems, is he's just untrustworthy [sic]; and I told him basically another attorney—I don't think he would be getting anything different. So—

THE COURT: Well, I think it's too late in the game for somebody to be asking for a new lawyer frankly. . . .

*Id.* at 9–10. The parties then discussed more specifics for the hearing, and the court read Mr. Cano-Varela's second letter into the record. After doing so, the court said, referring to Mr. Cano-Varela:

> I want to see him in person. We'll get an interpreter.
> . . . .
> All right. Well, we'll see what we can do. . . . [I] tell you what I'm going to start doing, though, because I'm fed up with this group of defendants who just think they can fire lawyers and they can enter into pleas, then renege on their pleas and enter into pleas. I'm probably not going to consider another plea from this guy. If I have to change lawyers, he's going to trial.

PROSECUTOR:    I think that's appropriate.

DEFENSE COUNSEL:    Right.

THE COURT:    And it would be—you know, I take it your assessment is that the evidence the government has against your client is pretty compelling?

DEFENSE COUNSEL:    Yes. My advice . . . to my client is that he should plead and that he would be convicted at trial.

THE COURT:    Well, I'd hate to see this kid lose an opportunity to get a fairly good deal and get safety valve simply because some jailhouse bird is whispering in his ear.

*Id.* at 12–13. The court and counsel then discussed other administrative matters, after which the court ended the status conference by stating:

[I]'ll talk to [Mr. Cano-Varela] personally. You know, I'm—if I'm going to grant a continuance, I'm probably not going to subject you to continue to represent him; but if I have to change counsel and order a new trial date, I'm going to make it abundantly clear to him that he's going to trial.

DEFENSE COUNSEL:    I think that will help as well.

. . . .

THE COURT:    All right. If he doesn't want to plead and he persists in wanting a trial, I'll let you out . . . and we'll get another lawyer.

DEFENSE COUNSEL:    That's fine, Judge. And if he—if he wants to proceed with trial, like I said, I'm fine with doing that if he wants to proceed with me. So I guess he can make that decision, though.

. . . .

THE COURT:    So, you know, it's frustrating, I know, to deal with this kind of problem, but let's see if we can visit with him and

-8-

see how he feels about it after we have this discussion on the record next week.  So I'll talk to you both next week on it.

*Id.* at 16–18.

### C.    The In-Court Status Conference

At the appointed time the following week, Mr. Cano-Varela appeared in court with his attorney.  The court asked defense counsel for an update on his discussions with his client.  Counsel responded that Mr. Cano-Varela wanted new counsel for two reasons: he "doesn't particularly like" the plea agreement, and "he has not been able to review his discovery in Spanish."  R. Vol. V, at 5. Counsel explained that, through an interpreter, he had "discussed at length with Mr. Cano the discovery," *id.*, but had not provided Spanish translations because "[t]he discovery basically is two inches of paper discovery . . . [and] approximately 15 or so CD ROM disks that you have to listen to on a computer," *id.* at 6.  Counsel also told the court that

> we have a plea agreement from the prosecution.  I have discussed that at length with Mr. Cano.  He has asked me if I can get him a better deal than that, and I have informed him that the prosecution will not offer anything better than that.  I've also informed him that if he chooses not to enter into that plea agreement with myself, the U.S. Attorney has informed me that they would not be offering a better deal to any other attorney.
> So I think Mr. Cano's position is that he hopes, I think, to obtain a better deal through another attorney which I don't think would happen, and/or wishes to proceed to trial with another attorney.  However, again, I don't know if another attorney would be able to do anything further in regard to providing discovery to him than what has already been done.  I have no problem continuing in representing Mr. Cano, whether he wants to proceed with trial and/or

a plea agreement; but I will leave that up to him and the Court at this point.

*Id.* at 6–7. The court asked the prosecutor what his position was on this point; he responded:

I think we were all anticipating a plea agreement in this case, all but the signatures if you will. . . .
    . . . .
    [I]n anticipation of a plea agreement in this case, we did ask—I think [defense counsel] did on behalf of his client—for a re-arraignment and a change-of-plea hearing. Where we left off with that, Your Honor, is . . . we provided [defense counsel] and his client with a proposed plea agreement. The essence of that, not that it's particularly germane today, but I'll just share it with the Court so that Mr. Cano knows where we stand and the Court likewise knows where we stand. With—the proposal we've made is with respect to the—Count One, the conspiracy count; that he would plead guilty to that. We think we have very compelling evidence. . . .
    [W]e believe he reasonably falls within a Level 32 base offense level. . . . [And] that he is a Criminal History Category I . . . .
    Therefore, he is safety-valve-eligible but for cooperation with the United States. We've extended an offer for him to sit down with us so that he may be eligible for that further two-level enhancement [sic]. If you include three levels for acceptance of responsibility, Mr. Cano could get all the way down to about 70 months.
    On the flip side of the coin, if he goes to trial, Mr. Cano is at least a 32, with no acceptance, no safety valve, no 5K consideration, and he stands to do well over ten years. So that's the essence of the conversation.
    I'll reiterate what [defense counsel] said. We have given our final offer in the case. We've talked about this a number of times, and our position is this is as good and as reasonably well as we can do in terms of a proposal for Mr. Cano.

THE COURT:     And there's no prospect that a change of lawyer would change your attitude. Is that what you're telling me?

PROSECUTOR:    That is true, Your Honor.

-10-

*Id.* at 7–9. Following this discussion, the court called the defendant and his lawyer to the stand and said:

Mr. Cano, candidly my concern is that you're listening to jailhouse lawyers. I'm talking about people who are self-taught in the law who are, like you, incarcerated. I would respectfully suggest to you, sir, that if they were such good legal minds, they wouldn't be in jail in the first place.

And my worry about your circumstance is that if the government's case is as compelling as the United States says it is and if your lawyer thinks it's prudent that you accept a deal that would allow you *to perhaps get a much better, much lesser sentence than would otherwise be offered if you were found guilty* and if you renege on that or decide not to go forward with the tentative deal reached with the government and are found guilty, you have very few options. *You'll be doing at least ten years in a federal penitentiary.*

Now, there's always the prospect that you could be found not guilty if the jury found the evidence against you wanting. Your lawyer apparently is of the opinion that that is a high-risk approach and it is not likely to be successful. If he thought otherwise, he would not be recommending this kind of deal to you. Of course, at the end of the day, the decision to plead or not plead to a crime is your decision alone. You cannot be compelled to plead if you do not wish to do so, no matter what your lawyer thinks. If you want to stand on your right to a trial by jury, it's my obligation to make sure you get a jury.

But if your desire to change lawyers is premised on the belief that your new lawyer would get a better deal than the current lawyer has been able to obtain from the government, the government's prosecutor in this case should have just disabused you of that notion.

. . . .

No doubt your lawyer has also told you that if you get this deal and if you do cooperate and if the government files a motion that you cooperated with them in the prosecution of other individuals and makes a motion for downward departure, that releases the judge from any obligation—it releases me from any obligation to impose a sentence—a mandatory minimum sentence or a sentence under the guideline range. I can sentence you in a way I deem appropriate, and your lawyer could argue that you're entitled to a couple more levels off for acceptance. *But there's no such offer, and there'll be no*

*opportunity to get this kind of a deal if a jury found you guilty. If the jury finds you guilty of the offense charged, then the sentence will, as [the prosecutor] said, be a harsh one.*

Now, the sentence that apparently is being proposed is certainly not a life sentence. I appreciate that. But you have to weigh the risks of trying a case versus pleading; and if you're satisfied—independently of your own lawyer, if you're satisfied that the government has sufficient evidence against you to prove the charges against you by proof beyond a reasonable doubt to a jury, then you need to be very careful about how you proceed from here.

*Id.* at 10–12 (emphasis added). The court then told Mr. Cano-Varela that it wanted to "have another conference with [him] on the record at the time of [his] re-arraignment," which was scheduled five days hence. *Id.* at 12. It continued:

[I]f, at that time, you decide that you do not want to take a plea from the United States and you persist in your desire to change your lawyer and go to trial and if your lawyer seeks to be discharged from his responsibility of you, I will order a change of lawyer, and I will order the matter to proceed to trial, and I will not then again consider a change of plea. So the only chance you'll have to have a plea considered by me is [at your re-arraignment]. If you do not plead—and that's certainly your privilege—I'll appoint a new lawyer for you at that time and set the trial date.

*Id.* at 12–13. After clarifying some procedural issues related to the upcoming re-arraignment, the court concluded the hearing by stating:

All right, Mr. Cano. That's the way I'm going to approach it for today. I'd ask that you very carefully consider your options. These are fateful decisions. They're your decisions to make alone. Hopefully you'll make them in consultation with your lawyer, but in the final analysis it's your decision to make. If you want to go to trial, those arrangements will be made. If you want to plead in accordance with the terms of the deal offered to you by the United States, that will have to occur [at your re-arraignment]. If you, at that time, inform me at your re-arraignment that you do not want to

plead, you can persist in your plea of "not guilty," and I'll set a trial date at that time.

PROSECUTOR: And that would be with a new attorney, Your Honor?

THE COURT: Would be with a new attorney unless, of course, Mr. Cano for some reason had a change of heart and wanted to keep his present lawyer. Otherwise we'd appoint a new lawyer, but there will not be—I will not revisit a change of plea. I will not revisit a plea agreement. I can't stop the defendant from making a cold plea in open court in the middle of the trial, but I certainly do not have to consider a plea. So I'm putting both parties on notice of that right now.

I see an unfortunate trend developing where people are suggesting that they not go forward with a plea. I had a young man last week who, for the second time, was offered a plea, and for the second time refused to enter a plea of guilty which is certainly his right, but I have spent all the time I'm going to on that young man's plea. Now he's going to have to let the jury assess his guilt or innocence. And that's where you are, Mr. Cano, and I certainly will respect any decision you make.

*Id.* at 14–16.

### D. Mr. Cano-Varela's Guilty Plea and Sentencing

On December 6, 2005, Mr. Cano-Varela signed a plea agreement. He agreed to plead guilty to counts one and three, the conspiracy counts, and the government agreed to move to dismiss count six, the substantive drug charge. The agreement specifically stated that Mr. Cano-Varela's "relevant conduct in this conspiracy involved at least 500 grams but no more than 1.5 kilograms of methamphetamine," R. Vol. II, Doc. 1059, at 5, and provided that the government would recommend an acceptance-of-responsibility reduction and file a

substantial-assistance motion if Mr. Cano-Varela earned them. The agreement also included an appeal waiver.

Two days later, Mr. Cano-Varela and his attorney appeared in court for a change-of-plea hearing. The plea colloquy proceeded as expected until defense counsel mistakenly advised the court that the agreement did not contain an appeal waiver though it in fact did. When the probation officer in attendance corrected the mistake, the court asked whether Mr. Cano-Varela understood that, because of the appeal waiver, "you don't even have the right to appeal the sentence I impose" unless the government first appealed. R. Vol. VI, at 25. Mr. Cano-Varela said that he did. *Id.*

Later in the hearing, the court asked Mr. Cano-Varela whether it was true that he "possessed, with intent to distribute[,] and distributed, at least 500 grams of methamphetamine" as part of the conspiracy. *Id.* at 34. He answered, "[i]t was a little less." *Id.* The court said it was "perplexed" by that answer because Mr. Cano-Varela stipulated in his plea agreement that his conspiratorial conduct "involved at least 500 grams but no more than 1.5 kilograms of methamphetamine." *Id.* The court again asked whether the stipulation's factual statement was correct, and Mr. Cano-Varela answered:

> No, sir. What I understood was that 500 grams is amongst all of them, all of us, but you asked me what was my participation.

> THE COURT: And so you're saying that the conspiracy involved the activities of others included in this "500 to 1.5 kilogram" stipulation? Is that what you're saying?
>
> THE DEFENDANT: No, sir. What I'm trying to say is that I participated in the delivery of a few ounces. That's what I did.

*Id.* at 35. At that point, the prosecutor asked for permission to summarize the evidence the government would introduce against Mr. Cano-Varela. After he did so, the court asked the defense whether it disagreed with the prosecutor's statements. Defense counsel said that Mr. Cano-Varela "disagrees with the overall amount but has reviewed the information through myself and has stipulated that this would be the amount that they could prove through relevant conduct." *Id.* at 39.

Mr. Cano-Varela then asked to speak to his lawyer. Following that off-the-record discussion, the court again asked Mr. Cano-Varela whether he disagreed with the government's representations. He answered, "No, sir." *Id.* at 41. The plea colloquy continued and the court ultimately accepted Mr. Cano-Varela's plea. *Id.* at 51.

The presentence report (PSR) prepared after Mr. Cano-Varela pleaded guilty calculated the defendant's total offense level as 31 and his criminal history category as I, resulting in an applicable Sentencing Guidelines range of 108 to 135 months. But due to a ten-year statutory mandatory minimum, 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846, the range became 120 to 135 months. The PSR also

noted that if Mr. Cano-Varela earned a substantial-assistance motion from the United States, his total offense level would become 29, resulting in a Guidelines range of 87 to 108 months.

Given his criminal history, Mr. Cano-Varela was eligible for application of the safety-valve guideline, § 5C1.2, which allows district courts to impose a sentence shorter than the statutory minimum if the defendant meets certain criteria. At the sentencing hearing, however, the government refused to move for the safety-valve departure, arguing that Mr. Cano-Varela did not "truthfully provide[] to the Government all information and evidence the defendant has concerning the offense or offenses" in which he was involved as § 5C1.2(a)(5) requires. The government argued that, during his proffer, Mr. Cano-Varela "tr[ied] to finesse the government" and "just did not want to talk about his own involvement specifically in a truthful way nor the involvement of sources." R. Vol. VII, at 16. The district court heard argument from both sides before stating:

> I recall the change-of-plea colloquy, and we had clearly a reticent defendant. The government believes that the information that was proffered or attempted to be proffered was not valuable to the government not because the defendant didn't know relevant or useful information but because he just wouldn't disgorge it. That clearly makes him ineligible for a safety valve application here.

*Id.* at 17. As a result, the ten-year mandatory minimum applied, making Mr. Cano-Varela's applicable Guidelines range 120 to 135 months. The court

sentenced him to 120 months, and Mr. Cano-Varela timely appealed. We have jurisdiction under 28 U.S.C. § 1291.

## II.

Mr. Cano-Varela argues that the district court violated Rule 11 of the Federal Rules of Criminal Procedure by participating in plea discussions. Both parties agree that we must review this claim for plain error because Mr. Cano-Varela did not object to the district court's comments below. *See* Appellant's Br. 22; Appellee's Br. 28. To show Rule 11 plain error, a defendant must show (1) error that (2) is plain which (3) affected his "substantial rights" and (4) "seriously affected the fairness, integrity or public reputation of judicial proceedings." *United States v. Vonn*, 535 U.S. 55, 62–63 (2002) (internal quotation marks and alteration omitted). This third element is met by "show[ing] a reasonable probability that, but for the error, [the defendant] would not have entered the plea." *United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004).

We are not so sure that plain error applies. It appears that all three legally trained participants in this proceeding shared the view that the plea agreement negotiated by defense counsel and the prosecutor was in Mr. Cano-Varela's best interest, and that Mr. Cano-Varela's reluctance to agree to the plea resulted from poor advice he was receiving from a jailhouse lawyer. In effect, the district judge's communications with Mr. Cano-Varela were intended to assist defense counsel in persuading the defendant to follow counsel's advice. Under the

-17-

circumstances, it is understandable that counsel would not object. In light of the primary purpose of Rule 11(c)(1)(C), discussed below, to avoid the possibility that comments by the district court might coerce the defendant into accepting a plea negotiated by defense counsel, we are hesitant to apply a heightened standard of review when defense counsel did not object to receiving the court's help. We need not resolve this question, however, because we conclude that even under the plain error standard, we must reverse.

Rule 11 permits prosecutors and defense attorneys, or defendants proceeding *pro se*, to "discuss and reach a plea agreement." Fed. R. Crim. P. 11(c)(1). In the next sentence, the Rule states, in no uncertain terms: "The court must not participate in these discussions." *Id.* As other circuit courts have noted, "the unambiguous mandate of Rule 11 prohibits the participation of the judge in plea negotiations under *any* circumstances: it is a rule that . . . admits of no exceptions." *United States v. Bruce*, 976 F.2d 552, 558 (9th Cir. 1992); *see also United States v. Cannady*, 283 F.3d 641, 644 (4th Cir. 2002) (collecting cases).

Rule 11 "'is designed to totally eliminate judicial pressure from the plea bargaining process.'" *United States v. Casallas*, 59 F.3d 1173, 1178 (11th Cir. 1995) (quoting *United States v. Corbitt*, 996 F.2d 1132, 1135 (11th Cir. 1993)). "Excluding the judge from the plea discussions . . . serves three purposes: it minimizes the risk that the defendant will be judicially coerced into pleading

guilty, it preserves the impartiality of the court, and it avoids any appearance of impropriety." *United States v. Kraus*, 137 F.3d 447, 452 (7th Cir. 1998).

We keep these ends in mind as we evaluate what type of conduct constitutes judicial participation in the plea negotiation process for purposes of Rule 11. Not all judicial comments relating to plea agreements violate the rule. For instance, as we have previously held, Rule 11's "stringent prohibitions . . . do not apply once the parties have concluded their agreement, and the prosecutor has laid it out in open court, even if the agreement is not formal and binding." *United States v. Carver*, 160 F.3d 1266, 1269 (10th Cir. 1998) (internal quotation marks and brackets omitted). "In other words, once the parties have 'hammered out' the details of their agreement, Rule 11[(c)] does not prevent the sentencing judge from questioning the defendant regarding the terms, consequences, and acceptance of the plea agreement or from providing the defendant with information relating to these matters." *Id.* This position appears to be uniform among the Courts of Appeals. *See, e.g.*, *Cannady*, 283 F.3d at 641; *United States v. Telemaque*, 244 F.3d 1247, 1249 (11th Cir. 2001) (per curiam); *Kraus*, 137 F.3d at 453–54; *United States v. Crowell*, 60 F.3d 199, 204 (5th Cir. 1996).

Similarly, Rule 11(c)(1) is not violated by a judge's comments made while implementing or planning docket or case-management decisions. One obvious example of this type of comment is a judge's refusal to extend a plea cut-off deadline. There is nothing inherently coercive about requiring a defendant "to

make *a* decision—either plead guilty or go to trial," *Cannady*, 283 F.3d at 645—so refusing to give a defendant more time to mull his options simply does not fall within the purview of the rule. And a judge does not violate the rule merely by inquiring into the status of plea negotiations, such as asking whether an agreement will be reached by the plea deadline.

Nor does the rule "establish a series of traps for imperfectly articulated oral remarks." *United States v. Frank*, 36 F.3d 898, 903 (9th Cir. 1994). In the course of managing trials, district judges must make snap judgments and occasionally may misspeak. *Id.* at 899–900. Rule 11 "protects the parties against implicit or explicit pressure to settle criminal cases on terms favored by the judge," *id.* at 903, and comments by the district judge must be evaluated in that light. *See also Carver*, 160 F.3d at 1269 ("[R]ule 11[(c)] prevents a judge from shaping the terms of a plea bargain or pressuring a criminal defendant to settle his case . . . .").

On the other hand, the Courts of Appeals all appear to hold that any "discussion of the penal consequences of a guilty plea as compared to going to trial is inherently coercive, no matter how well-intentioned." *United States v. Johnson*, 89 F.3d 778, 783 (11th Cir. 1996); *see also Bruce*, 976 F.2d at 558 ("No matter how benign the court's intent, its awesome power to impose a substantially longer or even maximum sentence in excess of that proposed is present whether referred to or not, and a defendant needs no reminder that if he rejects the

proposal, stands upon his right to trial and is convicted, he faces a significantly longer sentence." (internal quotation marks and alteration omitted)). Likewise, after rejecting a proposed plea, a court may not offer guidance regarding what terms in a subsequent plea agreement it would find acceptable. *Kraus*, 137 F.3d at 454. We agree with the Fourth and Fifth Circuits that errors such as these "almost inevitably seriously affect the fairness and integrity of judicial proceedings" and affect substantial rights as required to prove plain error. *United States v. Bradley*, 455 F.3d 453, 463 (4th Cir. 2006) (citing *United States v. Miles*, 10 F.3d 1135, 1141 (5th Cir. 1993)).

Applying these rules to Mr. Cano-Varela's case, we find the majority of the district court's comments quoted above to be unobjectionable. Nothing the district court said during the first status conference even approximates a Rule 11 violation. The district court's remarks during the second status conference fall into two different categories. The district court did not impermissibly participate in the plea negotiation process by stating its plan to require Mr. Cano-Varela to go to trial if he wanted a new lawyer; as noted, Rule 11 does not require district courts to repeatedly push back plea deadlines. And while the district court's inquiry into what kind of deal the parties had reached is closer to the line, we need not decide whether that question, in isolation, constituted a Rule 11(c)(1) violation because we conclude that we must reverse based on other, more clearly impermissible, remarks during the in-court status conference.

By informing Mr. Cano-Varela that he would "be doing at least ten years in a federal penitentiary" if he did not plead and was found guilty at trial, R. Vol. V, at 10, and that a post-trial "sentence will . . . be a harsh one," *id.* at 12, the court crossed into territory clearly forbidden by Rule 11. *See, e.g.*, *Johnson*, 89 F.3d at 783. We do not doubt that the district court was motivated by a sincere desire to see Mr. Cano-Varela get the best possible outcome under the circumstances. Rule 11, however, contains no avuncular-judge exception. It contemplates—for the reasons outlined above—that such advice should come from the defendant's lawyer, not from the court.

The government urges us to find that the district court did not participate in the plea discussions because it repeatedly reminded Mr. Cano-Varela that he had the choice to plead guilty or to go to trial, and that his trial would be fair if that was the route he chose. The government also argues that "the court was not putting its imprimatur on the specifics of the still largely undisclosed 'deal,'" but rather was "simply expressing a quite legitimate concern that the Defendant could be misled [into] opting for a course of action his lawyer thought to be wholly contrary to his interest, solely because he was being influenced by the legal hobbyists sharing jail space with him." Appellee's Br. 40.

These observations may be factually correct, but they miss the point: the court's comparison of a post-trial sentence to a post-plea sentence was inherently coercive. *Johnson*, 89 F.3d at 783. Before the in-court status conference, Mr.

Cano-Varela expressed the desire to switch lawyers and to proceed to a jury trial. But after the person who would be sentencing Mr. Cano-Varela pointed out the contrasting results, the defendant changed his mind and pleaded guilty. Even if the defendant changed his mind for some reason unrelated to this colloquy, the judge's remarks tainted everything that followed.

Keeping in mind the rationales underlying Rule 11(c)(1), we are forced to conclude that the court's comments may have coerced the defendant into entering the plea when he otherwise would not have. This obviously affected his substantial rights. And by this course of action, the judge may have created in "the public . . . the 'misleading impression' that a judge is anything less than a 'neutral arbiter'"—an error that "seriously affect[s] the fairness and integrity of judicial proceedings." *Bradley*, 455 F.3d at 463. These two conclusions satisfy the third and fourth elements of the plain error test, *see Vonn*, 535 U.S. at 62–63; accordingly, we hold that plain error exists here.

We understand the district court's concern about defendants attempting to drag out their cases indefinitely by flip-flopping on plea deals. And we are mindful that one purpose of the in-court status conference was to advise the defendant that another lawyer would not have been able to negotiate a better plea deal. But the court could have addressed both issues during the status conference without invoking the disparate consequences attendant to pleading guilty versus going to trial. Had it done so, this would be a very different case. But given

-23-

what actually took place, we hold that the district court violated Rule 11(c)(1) and that Mr. Cano-Varela must be allowed to withdraw his plea.

Finally, we address whether proceedings following remand should occur before the same district judge. Other circuits have held that where a Rule 11(c)(1) violation has occurred, the case should be reassigned to another district judge on remand "even if there is no evidence that the judge is vindictive or biased, as a means to extend the prophylactic scheme established by Rule 11 and to prevent the possible misimpression created by the judge's participation." *Corbitt*, 996 F.2d at 1135 (citing *United States v. Barrett*, 982 F.2d 193, 196 (6th Cir. 1992)). We find this reasoning persuasive and adopt it. We therefore hold that Mr. Cano-Varela's case must be reassigned to a different district judge on remand.

## CONCLUSION

We **VACATE** Mr. Cano-Varela's guilty plea and sentence and **REMAND** for proceedings consistent with this opinion.