RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0082p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 14-5046

DANIEL L. USHERY, JR.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 2:13-cr-00027—David L. Bunning, District Judge.

Argued: March 4, 2015

Decided and Filed: May 6, 2015

Before: CLAY, GILMAN, and SUTTON, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Christopher F. Cowan, Columbus, Ohio, for Appellant. Daniel Steven Goodman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Christopher F. Cowan, Columbus, Ohio, for Appellant. Daniel Steven Goodman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Anthony J. Bracke, UNITED STATES ATTORNEY'S OFFICE, Ft. Mitchell, Kentucky, for Appellee.

GILMAN, J., delivered the opinion of the court in which SUTTON, J., joined. CLAY, J. (pp. 20–27), delivered a separate dissenting opinion.

1

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge.  During an August 14, 2013 rearraignment, Daniel L. Ushery, Jr. pleaded guilty to the distribution of crack cocaine.  He was not prepared to plead guilty when the rearraignment first began.   Instead of adjourning the rearraignment, however, the district court oversaw a back-and-forth negotiation between the government's attorney and Ushery's counsel concerning specific provisions of a potential plea agreement. Only after the government offered to strike the appeal-waiver provision from the proposed plea agreement—which occurred during the course of the colloquy with the district court—did Ushery express an intent to plead guilty.  The court eventually accepted Ushery's plea and, in December 2013, sentenced him to 252 months in prison, an upward variance of 17 months from the top end of the applicable Sentencing Guidelines range.

Ushery timely appealed, arguing that (1) the district court violated Rule 11(c)(1) of the Federal Rules of Criminal Procedure's ban against judicial participation in plea discussions, (2) Ushery's exclusion from an August 6, 2013 pretrial teleconference violated his right to be present at every critical stage of the proceedings, and (3) his 252-month sentence was substantively unreasonable.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.    Underlying offense

Ushery, in April 2012, sold approximately half a gram of crack cocaine to a confidential informant in Campbell County, Kentucky for $100.  When a police officer attempted to arrest Ushery for the offense, Ushery escaped in his car, running red lights and stop signs in the process.  Only when Ushery crashed his car into a shed did the motorized chase end.  He then fled on foot until he was eventually apprehended.  The pursuing officer dislocated his shoulder in the process and subsequently retired due to the injury.

Upon Ushery's arrest, he was found to be in possession of small amounts of heroin, crack cocaine, and marijuana, as well as $329.50 in cash. Ushery also admitted to swallowing two bags of heroin during the pursuit. He further admitted to selling drugs in the past. At the hospital where he was transported, Ushery threatened to kill the arresting officer and the officer's family.

While in jail, Ushery called his girlfriend and asked her to retrieve money from a storage unit in Cincinnati, Ohio. The call was recorded by the police. After obtaining a search warrant, the police searched the storage unit and seized $8,781 in cash, a Marlin rifle, a .22 caliber handgun, ammunition, two boxes of baseball cards, and a digital scale.

A grand jury indicted Ushery in May 2013 for distributing crack cocaine, for possessing crack cocaine with the intent to distribute, and for possessing heroin with the intent to distribute, all in violation of 21 U.S.C. § 841(a)(1). The indictment also sought criminal forfeiture of the items seized from Ushery's person and from his storage unit. As part of the proceedings, the government filed a notice pursuant to 21 U.S.C. § 851(a)(1) that Ushery had been convicted of three prior felony drug offenses.

**B.      Arraignment and plea discussions**

Ushery pleaded not guilty during his initial arraignment on May 16, 2013. On June 27, 2013, Ushery's counsel filed a motion for rearraignment, which the district court set for July 2. But Ushery again declined to plead guilty at the July 2 rearraignment, despite his counsel informing the court that Ushery had previously told counsel that "he was not going to trial" and that "he would have to plead." His counsel alerted the district court to Ushery's concern about being sentenced as a career offender, relating Ushery's statement to counsel that "he cannot take that much time."

During the rearraignment, Ushery expressed frustration with his counsel: "[My attorney is] making moves in this case without me. So I don't even feel comfortable with him representing me. . . . I would like, if possible, just to have another attorney." The court granted Ushery's motion for new counsel and scheduled a status conference for July 9, 2013.

At the July 9, 2013 status conference, Ushery's new counsel stated that he and Ushery were "on the same page," and that he had explained to Ushery that they would either "resolve [the case] by plea or . . . resolve it by trial." The district court set August 19, 2013 as the trial date and August 6, 2013 as the date of the final pretrial conference. It also set August 2, 2013 as the last day for Ushery to file a motion for rearraignment to enter a guilty plea. Ushery's counsel filed such a motion on August 2, at which time he also filed a motion to continue the rearraignment date. The court granted both motions and converted the August 6 pretrial conference into a telephonic status conference.

### 1.      *The August 6, 2013 teleconference*

On August 6, 2013, the government's attorney and Ushery's counsel, but not Ushery, participated in a teleconference with the district court. The court called for the conference "to determine how [to] proceed going forward." Ushery's counsel informed the court that he had filed the motion for rearraignment "because there were concerns" about the court's deadline for doing so, but that Ushery had not yet made a decision. In discussing whether to push the trial date back a week, the court asked if Ushery needed the additional time "to try to work out final details of a plea agreement." Ushery's counsel responded affirmatively: "The resolution is a plea or a trial. Well, I can represent [that Ushery] doesn't want to go to trial, but he's concerned about signing. I said you have to make a decision. If I have a little more time, I can get it resolved."

In response, the court asked if Ushery's counsel thought "it would help to have a hearing with [Ushery] to discuss that with him." Counsel said yes. The court accordingly set a "tentative plea date" for August 14, 2013, and moved the trial date to August 26, 2013. It also stated that "if the defendant pleads guilty on [August 14], he will be entitled to all points for acceptance of responsibility. Any pleas after that date will jeopardize that."

### 2.      *The August 14, 2013 rearraignment*

The district court began the August 14, 2013 rearraignment by informing Ushery that the government's attorney and Ushery's counsel had participated in a brief teleconference with the court "to discuss the potential of having [Ushery] enter a plea of guilty." So that Ushery would

"receiv[e] all credits for acceptance of responsibility," the court stated that August 14 was "like a drop-dead date" for pleading guilty. Ushery's counsel replied by saying that Ushery would not be pleading guilty that day: "We're not at this point prepared to enter that plea." Just a few sentences later, Ushery's counsel reiterated the point: "At this stage, [Ushery]'s not ready to enter a plea. As I said to him, I'll be here on the 26th."

The district court, however, continued to engage with Ushery's counsel, and soon with Ushery himself, about the latter's decision regarding a potential guilty plea:

> [USHERY'S COUNSEL]: . . . [Ushery] does not want to waive his right to appeal.
>
> THE COURT: He doesn't need to waive his right to appeal.
>
> [USHERY'S COUNSEL]: If I'm not mistaken, you're indicating you're satisfied with the plea agreement with the exception of paragraph 8. Is that accurate, Daniel?
>
> THE DEFENDANT: Somewhat. I mean, I feel like there's too much time involved. But I would like to have a right to appeal, because I want my case [reviewed], because I feel like I'm being muscled into taking this time.
>
> THE COURT: You don't need to be muscled to do anything, sir. You have the right to a jury trial. We have a jury trial on the 26th.
>
> THE DEFENDANT: It's obvious I'm going to lose the jury trial.
>
> THE COURT: All I've done is review the record. I know what the criminal complaint and the affidavit says. I know generally what the facts are going to be, as presented to the jury. Guilt or innocence is one determination. Sentencing is another determination. Of course, what you do today or potentially do today impacts the sentence, and I'm sure [your attorney] has told you that. I am not going to allow you, nor is [your attorney] going to allow you to be muscled into doing anything that you don't want to do yourself.

Ushery continued to articulate his hesitation with pleading guilty: "I've been informing [the government] that I didn't want to go to trial. I would just -- like 15 years is too stiff. . . . I'm trying to figure out a way to attack this career criminal [enhancement] without wasting nobody's time." The court responded by assuring Ushery that he could make whatever arguments he felt appropriate, while also acknowledging that the court would have to consider the Sentencing Guidelines, including possible career-offender status, in determining Ushery's sentence. Ushery was again advised by the court that he could plead guilty, with or without a plea agreement, or instead go to trial.

But the district court also warned Ushery about the consequences of failing to plead that day: "[T]oday is the last date that I'm going to permit you to plead guilty if you want to plead guilty and receive that third point for acceptance of responsibility," and explained the purpose behind the third point. The government's attorney then interjected as follows:

> Judge, if our holdup [is that] Mr. Ushery would like to reserve the right to appeal his sentence, I'm willing to amend the plea agreement to allow him to appeal the length of his sentence. If that's our holdup here and if that's what Mr. Ushery was looking for in a plea agreement that he didn't have before, I'm willing to do that. I know that's not a negotiation with the Court, and the Court stays out of those things.

> But Mr. Ushery, I guess my point is if the agreement is acceptable except for the language in paragraph 8, then we can change that to say that with the exception that the defendant may appeal the length of sentence, period. That way, whatever sentence is imposed, Mr. Ushery will have the right to appeal. If that's the thing holding Mr. Ushery up, I'm willing to make that concession, given the nature of the background of this case.

The district court responded, "Very well," before either Ushery or his counsel had said a word. After conferring with Ushery off the record, his counsel said to the court that Ushery "inten[ds] to enter a guilty plea, but he adamantly does not want to waive any appeal as it relates to the length of the sentence." The government then agreed to delete paragraph 8, which contained the appeal waiver, from the plea agreement.

> With the agreement not yet finalized, the discussion next turned to forfeiture:

> [USHERY'S COUNSEL]: We'll have to have a hearing on the forfeiture. We're not talking forfeiture.

> THE COURT: One of the items of forfeiture is baseball cards.

> [USHERY'S COUNSEL]: That's one of his gripes. I can understand that too.

> . . .

> [GOVERNMENT'S COUNSEL]: If our holdups are the appeal and the baseball cards, those things aren't sufficiently -- if he wants to enter a guilty plea, we'll cross out paragraph 8 and we'll return the baseball cards.

> THE COURT: All right.

> [USHERY'S COUNSEL]: He doesn't want to waive his right to a forfeiture hearing on the money. I'm not trying to negotiate with the Court. I beg your pardon for not standing.

[GOVERNMENT'S COUNSEL]: We'll litigate the forfeiture at the sentencing.

[USHERY'S COUNSEL]: That's what we'll do, litigate it at the sentencing.

THE DEFENDANT: I don't know really what's going on because I don't have no --

[USHERY'S COUNSEL]: That's what we intend to litigate, you got me? I think things are in order, Your Honor.

The district court then asked the parties if they had reached a written agreement: "Do we have a written plea agreement that is commensurate with the agreement to adjudicate any disputes regarding the forfeiture allegation at sentencing and to strike the two boxes of baseball cards from the agreement to allow those to be returned to him?" The government answered that they did: "Judge, we'll just remove paragraph[s] 6 and 8 from the plea proposal. Paragraph 6 is the one that says he agrees to forfeiture. Paragraph 8 is the one that waives his appellate rights. We can cross those two paragraphs off, and I think we can proceed." Without a word from either Ushery or his counsel, the court said that it would look at the modified agreement: "All right. If you'd like to propose that, I'll take a look at it."

Seeing that a plea agreement had been reached, the district court directed the clerk to place Ushery under oath and then proceeded to question him:

> THE COURT: Mr. Ushery, let me just start by confirming with you that you've had enough time to consult with your new lawyer . . . prior to today. Have you had enough time to talk to him about your options in this case?
>
> THE DEFENDANT: I mean, I really don't feel like I have, but I guess.
>
> THE COURT: All right. What would more time do for you?
>
> THE DEFENDANT: I mean, I just, I'm really concerned about the career criminal [enhancement] because I don't want to be sent away for the rest of my life.
>
> THE COURT: I recognize that, but would more time make it easier for you or more difficult? I'm trying to get to the bottom of your hesitation. The career offender provision of the guideline, I'll go over it with you here in a little bit, but what I'm going to tell you now, what I told you earlier as you were sitting there, the Court will not muscle you, nor will your lawyer or the prosecutor, into doing something that you don't want to do.
>
> Sometimes, individuals are given what's called a Hobson's choice, and that's where all your choices are bad. This may be one of those times for you.

When the court again asked if Ushery had "had enough time to make that informed decision," Ushery responded affirmatively: "Yes, sir."

Ushery ultimately pleaded guilty to Count 1 of the indictment—the distribution of crack cocaine—in violation of 21 U.S.C. § 841(a)(1). Pursuant to the plea agreement, the other two counts were dismissed. The court accepted the plea, found Ushery guilty of the offense, vacated the August 26, 2013 trial date, scheduled a forfeiture hearing for December 3, 2013, and set the case for sentencing on December 17, 2013.

## C.    Forfeiture and sentencing

At the outset of the December 3, 2013 forfeiture hearing, Ushery's counsel informed the district court that Ushery "desired to forego the hearing in lieu of a settlement." The court promptly approved the parties' settlement agreement, which provided for the forfeiture of the currency, guns, and ammunition and the return of the boxes of baseball cards, pocket digital scale, and backpack containing personal items.

That left only sentencing. The Presentence Report (PSR), prepared in November 2013, calculated Ushery's adjusted offense level at 18, starting with a base offense level of 14 and adding two two-level enhancements. But the PSR also found that the career-offender enhancement applied, pursuant to U.S.S.G. § 4B1.1, such that Ushery's actual base offense level was 34, regardless of the adjusted offense level. After reducing his offense level for the acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a), Ushery's total offense level became 31. That offense level, combined with a criminal history category of VI, produced a Guidelines range of 188 to 235 months in prison.

At the December 17, 2013 sentencing hearing, the district court first determined what Ushery's adjusted offense level would have been in the absence of the career-offender enhancement. The court agreed with the PSR that a two-level enhancement applied for possessing a firearm and that another two-level enhancement applied for making a credible threat to use violence (against a government official and his family). In addition, the court found applicable a two-level enhancement for obstructing justice (by swallowing two bags of heroin during the pursuit) and a two-level enhancement for recklessly creating a substantial risk of

serious bodily injury (to a law-enforcement officer) in the course of fleeing. Ushery's adjusted offense level was therefore 22 and not 18. But as the court pointed out, that had no actual effect on Ushery's Guidelines calculation because the base offense level for career offenders is 34. The court agreed with the PSR that, with a three-level reduction for acceptance of responsibility and a criminal history category of VI, Ushery's advisory Guidelines range was 188 to 235 months in prison.

The district court next considered the 18 U.S.C. § 3553(a) sentencing factors. It emphasized that Ushery has "been a drug trafficker for practically [his] entire life in one way, shape or fashion." The court also pointed out that other enhancements that would have applied—for possession of a firearm, threatening to use violence, obstruction of justice, and reckless endangerment during flight—were not taken into account by the career-offender enhancement that ultimately applied. Referring again to those aggravating factors, the court expressed the need to impose "[a] sentence that reflects the serious[ness] of the offense." It specifically noted the damage that Ushery had caused: "Your flight caused an injury that caused a police officer to ultimately retire. Your flight caused property damage to an individual who came here for the sentencing today." The court further pointed to Ushery's "very significant" criminal history (including more than 10 juvenile and 20 adult convictions) and reasoned that prior sentences had had "no deterrent effect" on Ushery thus far.

As for potentially mitigating factors, the district court noted Ushery's difficult upbringing, his mental-health problems, and the small amount of drugs at issue in the present case. Nevertheless, the court decided that "a variance upward is necessary to reflect the seriousness of the offense and to provide just punishment as well as protect the public, given the fact that the defendant has been a menace to society practically his entire life." It also noted that "a sentence [of 120 months] as requested by the defendant would create a disparity among similarly situated defendants convicted of similar offenses."

The district court ultimately sentenced Ushery to 252 months of imprisonment, an upward variance of 17 months from the top of the applicable Guidelines range, to be followed by ten years of supervised release, which was within the Guidelines range of six years to life.

Ushery timely filed this appeal in January 2014, after the court granted him an extension of time to do so.

## II.  ANALYSIS

**A.     The district court did not commit plain error, even if it improperly participated in plea discussions during Ushery's August 14, 2013 rearraignment**

Ushery argues that the district court violated Rule 11(c)(1) of the Federal Rules of Criminal Procedure by participating in plea discussions at his August 14, 2013 rearraignment. By allowing the parties to negotiate the final terms of a plea agreement in its presence, the district court at the very least did not follow best practices, and may in fact have violated Rule 11(c)(1).  But Ushery has not met his burden of showing that any error affected his substantial rights, as the plain-error standard of review requires.  Because the record instead reflects that Ushery would likely have pleaded guilty even without the court's participation, the district court did not commit plain error.

### 1.     *Standard of review*

"We generally review unpreserved Rule 11 errors for plain error."  *United States v. George*, 573 F. App'x 465, 471 (6th Cir. 2014) (citing *United States v. Davila*, 133 S. Ct. 2139, 2147 (2013) (*Davila I*)).  Ushery admits that he did not object to the alleged Rule 11 violation below.  To establish plain error, the burden is on the defendant to show (1) error that (2) was plain, (3) affected defendant's substantial rights, and (4) seriously affected the fairness, integrity, or public reputation of the judicial proceedings.  *United States v. McCreary-Redd*, 475 F.3d 718, 721 (6th Cir. 2007) (citing *United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir. 1998)).

Ushery, however, argues that "extraordinary circumstances" excuse his silence, such that the harmless-error standard under Rule 52(a) of the Federal Rules of Criminal Procedure should apply instead of the plain-error standard.  Rule 52(a) provides that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."  Fed. R. Crim. P. 52(a).  The government bears the burden of showing harmless error when Rule 52(a) applies, *Davila I*, 133 S. Ct. at 2147 (citing *United States v. Vonn*, 535 U.S. 55, 62 (2002)), which is why Ushery urges the application of Rule 52(a) rather than the plain-error standard.

In *Davila I* (the case on which Ushery relies), the Supreme Court remanded the case to the Eleventh Circuit to decide whether the harmless-error or the plain-error standard of review applied to the defendant's claim that the magistrate judge violated Rule 11(c)(1). *Id.* at 2150. The Eleventh Circuit subsequently held that the plain-error standard applied. *United States v. Davila*, 749 F.3d 982, 993 (11th Cir. 2014) (*Davila II*).

Nevertheless, other circuits have suggested that an unobjected-to Rule 11(c)(1) violation may warrant a less exacting standard of review than plain error. *See United States v. Kyle*, 734 F.3d 956, 962 (9th Cir. 2013) ("Some courts of appeal, including this circuit, have recognized that it may be inappropriate to penalize a defendant for his counsel's failure to object to an error where such objection was either unlikely or futile."); *United States v. Nesgoda*, 559 F.3d 867, 869 n.1 (8th Cir. 2009) (declining to decide the issue on collateral review, but acknowledging that the defendant's "policy arguments in support of a lesser standard of review are somewhat compelling"); *United States v. Baker*, 489 F.3d 366, 372-73 (D.C. Cir. 2007) (calling the proper standard of review a "close question" in light of "the virtual catch-22 defendants are faced with when courts inject themselves into plea negotiations"); *United States v. Cano-Varela*, 497 F.3d 1122, 1132 (10th Cir. 2007) (expressing hesitance at "apply[ing] a heightened standard of review when defense counsel did not object to receiving the court's help").

None of these courts actually reached the issue, but the *Kyle*, *Baker*, and *Cano-Varela* courts all assumed without deciding that plain-error review applied because, in each case, the court found that the defendant's proof met the plain-error standard. *Kyle*, 734 F.3d at 962-63; *Baker*, 489 F.3d at 373; *Cano-Varela*, 497 F.3d at 1132. Even the *Davila II* court acknowledged that "it may be inappropriate in certain circumstances to penalize a defendant for failing to object to judicial participations in plea negotiations." 749 F.3d at 992. But in finding plain error to be the proper standard, the Eleventh Circuit noted that it had previously "applied the contemporaneous objection rule even in situations where counsel may not desire to object." *Id.* at 993.

We find Ushery's situation similar to that of the defendant in *Davila II*. In his appellate brief, Ushery claims that he did not have a meaningful chance to object during the August 14,

2013 rearraignment, and "[e]ven when [he] later did speak up, he was interrupted by his own defense counsel, and lectured by the district court about his hesitancy to plead guilty and having to make a 'Hobson's choice.'" But even if we were to assume that his counsel's actions deprived him of a meaningful opportunity to object during the rearraignment, Ushery nevertheless "had ample occasion to object himself in the months following the [district judge's] comments," including at his December 17, 2013 sentencing hearing. *See Davila II*, 749 F.3d at 993. Ushery, however, did not object until the instant appeal. We therefore review his claim under the plain-error standard.

### 2. *We need not decide whether the district court's conduct amounted to error that was plain, although it certainly violated best practices*

Rule 11 absolutely prohibits judicial participation in plea negotiations: "An attorney for the government and the defendant's attorney . . . may discuss and reach a plea agreement. The court must not participate in these discussions." Fed. R. Crim. P. 11(c)(1). "Under Rule 11, the judge's role is limited to acceptance or rejection of the plea agreement after a thorough review of the relevant factors; the judge should not participate in the plea bargaining process." *United States v. Harris*, 635 F.2d 526, 528 (6th Cir. 1980).

"The primary reason for Rule 11 is that a judge's participation in plea negotiation is inherently coercive," even if it is not intended to be. *United States v. Barrett*, 982 F.2d 193, 194 (6th Cir. 1992), *abrogated on other grounds by Davila I*, 133 S. Ct. 2139 (2013). In finding that a Rule 11(c)(1) violation had occurred, the Eleventh Circuit recently explained that the district court's participation in the plea-bargaining process is prohibited "because statements and suggestions by the judge are not just one more source of information to plea negotiators; they are indications of what the judge will accept, and one can only assume that they will quickly become the focal point of further discussions." *United States v. Harrell*, 751 F.3d 1235, 1239 (11th Cir. 2014) (internal quotation marks omitted).

The comments at issue in the present case raise significant Rule 11 concerns. During the August 14, 2013 rearraignment, the district court oversaw a back-and-forth negotiation between the government's attorney and Ushery's counsel concerning specific provisions of a potential plea agreement. The government offered to strike the appeal-waiver provision from the proposal

after Ushery's counsel raised the issue and the district court stated that Ushery need not waive his right to appeal.  Only then did Ushery express an intent to plead guilty.

The government also agreed to return Ushery's baseball cards after the district court, on its own, raised the cards as an issue.  During the forfeiture discussion, Ushery attempted to interject ("I don't really know what's going on because I don't have no --"), but he was cut off by his own attorney.  Moving along, the court asked if there was a writing that reflected the parties' recent agreements.  The government responded that it would cross out paragraphs 6 (regarding forfeiture) and 8 (regarding appellate waiver) from the proposal, to which the court replied with apparent approval (and without waiting to hear from Ushery or his counsel): "All right.  If you'd like to propose that, I'll take a look at it."

Here, the district court did not simply accept the plea after it had been finalized.  The court instead commented on a proposed plea that Ushery had not yet agreed to, and the specific items that the court raised became the focal points—indeed, the only points—of the continued negotiation.  Even if the court did not go so far as to violate Rule 11(c)(1), it certainly violated best practices by allowing the government's attorney and Ushery's counsel to negotiate specific terms of a proposed plea agreement in its presence.  The court could easily have asked the parties to step out of the courtroom or adjourned the rearraignment to a later date, rather than preside over what were clearly plea negotiations.

What's more, some of the district court's comments might have suggested that it favored a plea agreement.  The court could be seen as hinting at a preference simply by overseeing the discussions.  *See Barrett*, 982 F.2d at 194 ("By intervening to facilitate a plea . . . , the judge communicated to the defendant that he desired a plea.  He thereby raised the possibility, if only in the defendant's mind, that a refusal to accept the judge's preferred disposition would be punished.").  In addition, the court's suggestion that Ushery faced a "Hobson's choice, . . . where all your choices are bad," could have led Ushery to believe that the court preferred for him to plead guilty.  Such comments could be seen as compromising the court's neutrality in assessing the voluntariness of the plea.  *See id.* at 195.

On the other hand, the district court may well have been acting with Ushery's best interests in mind.  "Nevertheless, there is no good motives exception to the bar on judicial

participation in plea discussions." *Harrell*, 751 F.3d at 1240. Nor do the court's repeated comments that the choice to plead guilty was Ushery's and Ushery's alone necessarily negate an error. *See United States v. Cano-Varela*, 497 F.3d 1122, 1134 (10th Cir. 2007) (rejecting the government's argument that "the district court did not participate in the plea discussions because it repeatedly reminded [the defendant] that he had the choice to plead guilty or to go to trial" under circumstances where "the judge's remarks [comparing a post-trial sentence to a post-plea sentence] tainted everything that followed").

Despite what appear to be good intentions on the part of the district court, some of the court's comments during Ushery's August 14, 2013 rearraignment raise legitimate Rule 11 concerns. The court at the very least did not follow best practices when it allowed counsel to negotiate certain terms of a proposed plea agreement in its presence. At worst, the court violated Rule 11(c)(1) by directly participating in the plea negotiations. We need not decide whether the court committed error that was plain, however, because Ushery has failed to show that his substantial rights were affected, which is the third prong of the plain-error standard.

### 3. *Ushery has not shown any error that affected his substantial rights*

To satisfy the plain-error standard of review, the error must affect Ushery's substantial rights. *See United States v. McCreary-Redd*, 475 F.3d 718, 721 (6th Cir. 2007). Ushery, in other words, "must show a reasonable probability that, but for the error, he would not have entered the plea." *See United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004). To reverse, we must determine, based on the entire record, "that the probability of a different result is sufficient to undermine confidence in the outcome of the proceeding." *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)) (internal quotation marks omitted).

Even if we were to assume that there was a violation of Rule 11, Ushery has failed to show a reasonable probability that, but for the district court's actions, he would have proceeded to trial. Two cases in which the Eleventh Circuit found a Rule 11 violation, but no prejudice, are instructive. In *Davila II*, the Eleventh Circuit listed five distinct factors suggesting that the defendant was not prejudiced, two of which overlapped with the court's prior ruling in *United States v. Castro*, 736 F.3d 1308 (11th Cir. 2013):

> Like the defendant in *Castro*, Davila (1) swore under oath during his change-of-plea hearing that his plea was not coerced and acknowledged that the Government could prove the conduct underlying his offense; and (2) later moved to withdraw his guilty plea but, in doing so, did not mention the improper comments and instead offered different reasons for doing so. . . . (3) Davila pled guilty three months after the Rule 11(c)(1) violation occurred, not—like the defendant in *Castro*—close on its heels; (4) the District Judge who approved Davila's plea agreement and conducted the plea colloquy was not the judge who committed the Rule 11(c)(1) violation—unlike in *Castro*, where the judge who took the defendant's plea was the same judge who made the improper remarks; and (5) Davila's final plea agreement was significantly more favorable than the agreement the Government initially offered him.

*Davila II*, 749 F.3d at 995-96. This list is not an exhaustive one, nor is any single factor dispositive, but an analysis of the factors is nonetheless helpful in assessing the prejudice, if any, that Ushery suffered.

Three of the five factors weigh against finding that Ushery's substantial rights were affected. Similar to the defendant in *Davila II*, Ushery admitted under oath that he had engaged in the conduct underlying his offense. The final plea agreement was also significantly more favorable to Ushery than the agreement that the government initially offered him, with the appellate-waiver and forfeiture clauses being deleted. Finally, unlike the defendant in *Davila II*, Ushery never moved to withdraw his guilty plea below. Ushery instead first raised the alleged Rule 11 violation nearly a year after he had pleaded guilty.

On the other hand, two of the five factors appear at first glance to weigh in favor of Ushery's claim that he was prejudiced: Ushery pleaded guilty immediately after the purported Rule 11 violation, and the same judge who participated in the colloquy also took Ushery's plea. The Supreme Court noted the government's acknowledgement in *Davila I* that "if there is a serious Rule 11(c)(1) error, and the defendant pleads guilty right after that, the error would likely qualify as prejudicial." *Davila I*, 133 S. Ct. at 2149 (internal quotation marks and alterations omitted). Further, "[i]n the vast majority of cases in which courts have found [that] a defendant was prejudiced by a Rule 11(c)(1) violation, the judge who made the improper comments was the same judge who took the plea." *Davila II*, 749 F.3d at 998 (collecting cases). But the fact that the Eleventh Circuit did not find substantial prejudice in *Castro* even when these two factors were present indicates that they, too, are not dispositive.

Moreover, these two potentially negative factors are substantially neutralized in the present case. The fact that Ushery pleaded guilty at the end of the colloquy, for instance, is offset by the fact that he took no steps to withdraw his guilty plea between the August 14, 2013 rearraignment and his sentencing hearing on December 17, 2013. For that matter, Ushery has *never* requested at any time to have his case tried on the merits. As for the same judge presiding over the plea negotiations and taking Ushery's plea, the comments made by the judge here were not nearly as "improper" as they were in *Castro*, 736 F.3d at 1311 ("Do you understand that the government has made you a plea offer in which they have made certain concessions, that if you don't plead today they may charge you with other things that will make your sentence even more severe?"), or in *Davila II*, 749 F.3d at 988 (where the magistrate judge urged the defendant to "go to the cross," accept responsibility, and plead guilty because "there may not be a viable defense" to the charges).

Further tipping the scales toward a finding of no prejudice is the fact that Ushery and his counsel stated on multiple occasions that Ushery did not want to go to trial. *See Dominguez Benitez*, 542 U.S. at 84-85 ("Relevant evidence [regarding the substantial-rights question] included [the defendant's] statement to the District Court that he did not intend to go to trial, and his counsel's confirmation of that representation, made at the same hearing."). The statements in the instant case included Ushery telling his first counsel that "he was not going to trial" and that "he would have to plead," his second counsel informing the court that Ushery "doesn't want to go to trial," Ushery commenting that "It's obvious I'm going to lose the jury trial," and Ushery explaining to the court that "I've been informing [the government] that I didn't want to go to trial. . . . I'm trying to figure out a way to attack this career criminal [enhancement] without wasting nobody's time."

Ushery might not have been ready to plead guilty at the beginning of the August 14, 2013 rearraignment, but these statements show that Ushery never seriously considered proceeding to trial. Combined with the other *Davila II* factors, the statements of Ushery and his counsel negate any reasonable probability that, but for the district court's involvement in the plea negotiations, he would not have pleaded guilty. We therefore conclude that Ushery's substantial rights were

not adversely affected by the proceedings at the August 14, 2013 rearraignment. He has thus failed to satisfy the plain-error test.

**B.      The district court's pretrial teleconference with counsel did not violate Ushery's right to be present at every critical stage of the proceedings**

Ushery also argues that the August 6, 2013 teleconference between the district court and counsel—but not Ushery—violated both his Fifth Amendment due process right to be present at every critical stage of the proceedings and his right under Rule 43 of the Federal Rules of Criminal Procedure to be present at every stage of trial. Because Ushery did not timely object to his absence at the August 6 teleconference, we review his claim under the plain-error standard. *See United States v. Taylor*, 489 F. App'x 34, 43 (6th Cir.), *cert. denied*, 133 S. Ct. 627 (2012) (reviewing the defendant's challenge to being excluded from most pretrial hearings, sidebars, and a hearing on counsel's conflict of interest under the plain-error standard because the defendant failed to contemporaneously object at trial).

A defendant has "a due process right to be present at a proceeding 'whenever his presence has a relation, reasonably substantial, to the fulness (sic) of his opportunity to defend against the charge.'" *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934)). Rule 43, in turn, requires a defendant to be present at "(1) the initial appearance, the initial arraignment, and the plea; (2) every trial stage, including jury impanelment and the return of the verdict; and (3) sentencing." Fed. R. Crim. P. 43(a).

The purpose of the August 6, 2013 teleconference, as noted by the district court, was "primarily to determine how [to] proceed going forward." During the short status conference, the district court and counsel moved the date of the trial and agreed to meet on August 14, 2013 for a "tentative plea date" with Ushery present. The teleconference appears to have been "a brief, administrative conference" that did not have "significant consequences" for Ushery and therefore was not a critical stage of the proceedings. *See Hereford v. Warren*, 536 F.3d 523, 529-30 (6th Cir. 2008) (finding that a short ex parte conference between the prosecutor and the judge during defendant's trial was "a *de minimis* communication that was administrative in nature" and did not qualify as a critical stage of the proceedings). We agree with the government's observation that, "[i]n fact, the upshot of the call was to afford Ushery the very

relief to which he now claims that he was entitled, namely, his presence during discussions concerning his decision whether to plead guilty."

Under these circumstances, Ushery did not have a right to be present at the August 6, 2013 teleconference. We therefore conclude that the district court did not err in conducting the brief teleconference without Ushery.

**C.     The district court's 252-month sentence was substantively reasonable**

Finally, Ushery challenges the substantive reasonableness of his 252-month sentence, which is an upward variance of 17 months from the top end of the applicable Sentencing Guidelines range. We review a sentence for substantive reasonableness under the abuse-of-discretion standard. *United States v. Zobel*, 696 F.3d 558, 569 (6th Cir. 2012). The review "take[s] into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51 (2007).

Although we may presume that sentences within the Guidelines are reasonable, we cannot presume that a sentence outside the Guidelines is unreasonable. *Zobel*, 696 F.3d at 569. For sentences outside the Guidelines range, we "may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Gall*, 552 U.S. at 51. The fact that we might have decided that a different sentence was more appropriate is not enough to justify reversal. *Id.*

Ushery claims in his brief that the district court abused its discretion by "bas[ing] its upward variance on Ushery's offense conduct and his prior criminal history" because "[t]hese factors are already taken into account in the Guidelines." Specifically, Ushery takes issue with the court considering "reckless endangerment during flight, obstruction, threatening the life of an officer, [and] presence of firearms" as aggravating factors when they were already captured by the sentencing enhancements (based on the same factors) that the court found to be applicable in Ushery's case.

The problem with Ushery's argument is that these enhancements did not actually affect his Guidelines calculation. Because Ushery was found to be a career offender, his base offense level was determined solely by that fact. The district court stated during the sentencing hearing

that it would "rather rule on all of [the objections] to create a complete record," but "with the caveat that if the Court finds the defendant to be a career offender under Chapter 4, the actual enhancements under Chapter 2 are not applicable as a matter of law." There was thus nothing improper about the court considering these aggravating factors.

In a similar vein, Ushery argues that his criminal history, recidivism, and the need for punishment—factors that the district court took into account—were already accounted for by the career-offender enhancement. But Ushery had far more than the two prior felony convictions required to establish career-offender status. *See* U.S.S.G. § 4B1.1(a). The district court noted that Ushery's criminal history "is very significant," involving "[m]ore than ten juvenile convictions [and] more than 20 adult convictions [that included] trafficking, robbery, escape, history of flight, [and] failure to complete probation." By taking Ushery's recidivism and the need for punishment into account, the court, far from abusing its discretion, was simply following § 3553(a)'s mandate that it consider "the need for the sentence imposed . . . to provide just punishment for the offense [and] to afford adequate deterrence to criminal conduct." *See* 18 U.S.C. § 3553(a)(2)(A)-(B).

In sum, the record reflects that the district court gave reasoned consideration to the relevant sentencing factors. The court justified its upward variance as "necessary to reflect the seriousness of the offense and to provide just punishment as well as protect the public, given the fact that the defendant has been a menace to society practically his entire life." It explained why it would not vary below the Guidelines, as Ushery requested, because such a sentence "would create a disparity among similarly situated defendants." The court also considered Ushery's upbringing, mental-health problems, and the small amount of drugs at issue in the instant offense. These are the same mitigating factors that Ushery points to in his appellate brief, but he does not argue—because he cannot—that the district court overlooked them. He simply disagrees with the district court's conclusion. Because that is an insufficient basis to justify reversal on substantive-reasonableness grounds, we conclude that the district court did not abuse its discretion by imposing a sentence of 252 months of imprisonment.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

————————————

**DISSENT**

————————————

CLAY, Circuit Judge, dissenting.  This case presents two questions, one of which is dispositive of the outcome, and both of which were wrongly decided by the majority.  Because I conclude that the district judge's participation in the plea negotiations, in violation of Rule 11(c)(1), was far from harmless, I would vacate Ushery's sentence and remand this case to the district court, where Ushery could enter a plea or, if he failed to do so, proceed to trial.

The facts of this case represent an archetypical example of the dangerous and slippery slope faced by judges and defense counsel when they choose to ignore bright-line procedural safeguards in pursuit of what they surmise is the most just, equitable, or efficacious outcome in a particular case.  Ushery was arraigned on May 16, 2013, and pleaded not guilty.  His counsel moved for a rearraignment for the purpose of Ushery entering a guilty plea.  Yet, instead of entering a guilty plea, Ushery expressed his displeasure with his counsel, pleaded not guilty, and asked for the appointment of a new attorney.  The district judge granted Ushery's request and reset the scheduled date of trial to a later date.  Ushery's new attorney also sought to schedule a rearraignment.  The district judge called for a telephonic conference to schedule this rearraignment and, again, pushed back the date of trial because "continuing the trial in this case" was in the "best interest" of Ushery and of the public.  (R. 19, Min. Ent.)  He noted, "I looked through the criminal complaint, and the facts of the case are fairly straightforward, at least as alleged in the complaint."  (R. 60, Tel. Conf. Tr., p. 2).  Defense counsel suggested that Ushery was not interested in a trial and if counsel was just given more time he could "resolve[]" Ushery's continued "concern[] about signing" the plea agreement.  (*Id.* at 6).  The district judge thereafter queried defense counsel as to whether or not "it would help to have a hearing with [Ushery] to discuss [his pleading options]."  (*Id.*)  After defense counsel replied affirmatively, the district judge indicated that he would "set a tentative plea date for" August 14, 2013.  (*Id.* at 8).  He also informed defense counsel that "[i]f [Ushery] does not plead guilty on that date, he may lose entitlement to the third point for acceptance of responsibility."  (R. 19, Min. Ent.)

Ushery did not attend the hearing on August 14, 2013 with the intention of pleading guilty. Nonetheless, the hearing began with the district judge informing Ushery that he had participated in a phone call with the prosecutor and defense counsel "to discuss the potential of having [Ushery] enter a plea of guilty." (R. 61, Hr., p. 2). He continued by informing Ushery that he had reached the "drop-dead date" for pleading guilty if Ushery still wished to receive all credit for acceptance of responsibility when it came to determining Ushery's sentence. (*Id.*) Defense counsel expressed his frustration, noting that he had discussed the plea with Ushery, but that Ushery had "issues that [defense counsel] [did not] necessarily agree with." (*Id.* at 3). Defense counsel noted that it was not his intent to "prejudice Mr. Ushery," his client, but that both he and the prosecutor thought that one final conversation in the presence of the district judge might be helpful. (*Id.*) During this conversation Ushery noted that he felt like he was "being muscled in[to] taking this time." (*Id.* at 4). The district judge explained to Ushery that it was his decision alone to make, that he was not wasting the court's time, and that if he wished to go to trial he could. But after some time, the conversation refocused on the consequences to Ushery if he did not plead guilty at that very hearing.

The district judge noted that "today is the last date that I'm going to permit you to plead guilty if you want to plead guilty and receive that third point for acceptance of responsibility." (*Id.* at 7). It was at this point that the negotiations began, with the prosecutor interjecting that he was willing to drop the appellate-waiver provision from the plea deal if that was the "holdup" for Ushery pleading guilty. (*Id.*) The district judge assented to the proposal; defense counsel conferred with Ushery off the record, and then affirmed that it was Ushery's intent to plead guilty.

The next topic up for discussion was forfeiture. After discussing whether or not forfeiture of Ushery's baseball cards was on the table, the district judge asked the prosecutor for his thoughts, and the prosecutor again agreed to modify the proposed terms to satisfy Ushery with respect to forfeiture, if he would only plead guilty. Defense counsel continued to negotiate terms by ensuring that he could still litigate whether money that had been seized from Ushery was subject to forfeiture. Ushery interjected, "I don't know really what's going on because I

don't have no—," but defense counsel cut him off to say "I think things are in order, Your Honor," and the negotiations concluded. (*Id.* at 9).

Immediately following this exchange, without inquiring into the basis for Ushery's confusion, the district judge asked whether the prosecutor had a written plea agreement that reflected the present understanding of the deal, save for the fact that the appellate-waiver provision and forfeiture of the baseball cards would need to be stricken. He next informed Ushery that he would be sworn-in to plead guilty while the prosecutor was "initialing" the changes being made to the proposed agreement. After Ushery was sworn in, he reiterated that he "really [didn't] feel like" he had been given "enough time to talk to" his attorney about his pleading options. (*Id.* at 10). The district judge asked rhetorically whether "more time [would] make it easier for [Ushery] or more difficult?" (*Id.* at 11). He reaffirmed that Ushery would not be muscled into taking a deal, but followed up that assurance by telling Ushery that he might be facing a "Hobson's choice . . . where all of [his] choices [were] bad." (*Id.*) The district judge again asked whether Ushery had been given enough time. This time, Ushery relented by saying, "yes, sir." (*Id.*)

Ushery was mostly compliant for the remainder of the hearing: as his rights were being communicated to him in *pro forma* fashion; as the sentencing procedure was explicated; and as he was being told that he would be unable to withdraw his plea after it was entered. There was, however, one other extended dialogue about Ushery's right to appeal his sentence. Ushery indicated that he still believed that his case had been "mishandled," partly because he could not comprehend how he went from being prosecuted in a state court to being subject to federal prosecution that would include a career offender enhancement as a part of his sentence. (*Id.* at 37). After receiving additional assurances from the district judge that he could appeal his sentence, but not the conviction or pleading decision, Ushery again reluctantly consented and pleaded guilty.

The outcome reached by the majority is not fairly supported by these facts, and is based on a misunderstanding of the law with respect to what constitutes prejudice to a substantial right. But before that issue is addressed, the first question presented by Ushery's case is, who should bear the burden of proof when this Court reviews a sentencing appeal in the context of a Rule

11(c)(1) violation. In my view, it is plain that the burden must rest with the government because requiring a contemporaneous objection by a defendant under these circumstances is completely unworkable, when, as a practical matter, there is no one to object on the defendant's behalf when his counsel has abdicated his responsibility to his client and is also involved in the violative activity.

## I.      Standard of Review

Rule 11 sentencing errors will not be reversed so long as they are harmless, but that does not mean that the burden of proof is unimportant and that this Court should impose a plain error standard. As noted by the majority opinion, four of our sister circuits have remarked favorably on the persuasive arguments in support of applying harmless error review in the context of a Rule 11(c)(1) violation. *See United States v. Kyle*, 734 F.3d 956, 962 (9th Cir. 2013); *United States v. Nesgoda*, 559 F.3d 867 n.1 (8th Cir. 2009); *States v. Baker*, 489 F.3d 366, 373 (D.C. Cir. 2007); *United States v. Cano-Varela*, 497 F.3d 1122, 1132 (10th Cir. 2007).[1] However, instead of engaging with a difficult issue, the majority has blindly followed the Eleventh Circuit's holding in *United States v. Davila*, 749 F.3d 892 (11th Cir. 2014) ("*Davila II*"). In doing so, a new precedent has been set without thoughtful consideration of the reality faced by a defendant who has just witnessed his attorney, the prosecutor, and the district judge presiding over his case, all working in tandem against him toward one goal—coercing the defendant into accepting a particular plea agreement.

The majority's holding suggests that a defendant confronted by such a situation should on his own accord stand up and say, "I object." The sheer improbability of this hypothetical objection will ensure that all Rule 11(c)(1) violations are subject only to plain error review, requiring the defendant to prove that his substantial rights were affected. This, in turn, may invite prosecutors, defense counsel, and the district courts, to employ unduly coercive negotiation tactics when faced with a criminal defendant who refuses to plead, or is reluctant to

---

[1]The Supreme Court in *United States v. Davila* ("*Davila I*"), albeit implicitly, also recognized some merit in considering the harmless error standard. *See* 133 S. Ct. 2139, 2150 (2013) ("[W]e leave [the standard of review] issue[] to be addressed by the Court of Appeals on remand.").

plead—especially when the defendant is being told that he is being offered a favorable plea deal and that the likelihood of conviction, were he to proceed to trial, is overwhelming.

There is simply no good reason for this Court to follow the holding of *Davila II*. Regardless of the similarities or lack thereof between this case and *Davila*,[2] I remain unpersuaded by the argument offered in that opinion in support of applying the plain error standard. In *Davila II*, the court reasoned that plain error review was appropriate simply because it had previously required a contemporaneous objection "in [a] situation[] where counsel may not desire to object." 749 F.3d at 993 (citing *United States v. Rodriguez*, 627 F.3d 1372 (11th Cir. 2010)). The prior incident, to which the court was referring, is inapposite. In *Rodriguez*, the defendant argued that no objection was required to preserve a claim for judicial bias because an attorney might reasonably fear that his client would receive a less favorable sentence after having accused the judge of bias. 627 F.3d at 1377. The court rejected this argument—reasoning, in part, that judges are not so petty as to warrant the concern that defendants will receive vindictive sentences, and attorneys are not so spineless that they would fail to make a valid objection when one is required. *Id.* at 1380. This reasoning has no application in the context of a Rule 11(c)(1) violation. Ushery's counsel failed to object in this case, not because he was too timid and fearful of angering the district judge, but because he was an active participant in the violation. Presumably, no attorney would object to his own actions; especially when the attorney is winning concessions that might induce his client to accept what the attorney believes to be a favorable plea or, at least, what the attorney believes to be the best possible outcome under the circumstances.

The majority suggests that whether or not the attorney might object is irrelevant because "Ushery . . . 'had ample occasion to object himself in the months following [the district judge's] comments.'" Maj. Op. at 12 (quoting *Davila II*, 749 F.3d at 993). In this instance, however, the passage of time is insignificant. It seems to me all too unlikely that defense counsel, after having

---

[2]The majority contends that the defendants are similarly situated, but they are not. For example, Davila entered into a plea agreement, and repeatedly affirmed that he was accepting the agreement absent any "pressure, threats, or promises," months after the magistrate judge (not responsible for sentencing Davila) committed the Rule 11 violation, whereas Ushery repeatedly resisted accepting this particular plea agreement and only consented after the sentencing judge strongly suggested to him that he had no better options to choose from. The only apparent similarity between Ushery and Davila is the weakness of their bargaining positions due to the strength of the unfavorable evidence to be presented in their respective cases.

participated in the impermissible negotiations, would advise Ushery that the district judge's actions at the hearing were objectionable. Furthermore, there is no reason to expect that Ushery would object without his counsel's advice. It is well understood that the Rule 11(c)(1) prohibition exists simply because defendants can easily be overborn by the formidible authority wielded by a district judge. *See, e.g., Cano-Varela*, 497 F.3d at 1132 (noting that the purpose behind the Rule is to "avoid the possibility that comments by the district court might coerce the defendant into accepting a plea negotiated by defense counsel"). Ushery was explicitly told by the district judge that once he pleaded guilty he would be unable to withdraw his plea. To expect that a lay person, under these circumstances, would intuitively understand that his rights had been violated and that he could thereafter object on that basis, after any length of time, is entirely unreasonable.

Because there is no legitimate expectation that a contemporaneous objection is likely to ever be made to a Rule 11(c)(1) violation under these circumstances, the plain error standard should not apply and the government should bear the burden of proof in applying the harmless error standard.

## II.    Plain Error and Substantial Right

Even if the plain error standard were appropriate, Ushery's plea should still be vacated. I agree with the majority that the district judge's actions in this case "raise[d] legitimate Rule 11 concerns." Maj. Op at 14. In fact, I have no doubt that a violation occurred, because "[u]nder Rule 11, the judge's role is limited to acceptance or rejection of the plea agreement . . . ." *United States v. Harris*, 635 F.2d 526, 528 (6th Cir. 1980). Once the judge has gone beyond that role, as the district judge did in this case, the rule has been violated.

To avoid offering Ushery any relief, the majority found that his substantial rights were not affected. This contention is plainly wrong. Ushery only needed to demonstrate "a reasonable probability that, but for the error, he would not have entered the plea." *United States v. Dominguez* Benitz, 542 U.S. 74, 83 (2004). He did that, even by the majority's own recounting of the facts. This conclusion is unsurprising, as most instances of Rule 11(c)(1) violations impact a defendant's substantial rights. *United States v.* Bradley, 455 F.3d 453, 463 (4th Cir. 2006) ("[I]t will be rare that a clear violation of Rule 11's prohibition against judicial

involvement in plea negotiations does not affect substantial rights."). However, relying on no case law whatsoever, the majority has required Ushery to show that "but for the district court's actions, he would have proceeded to trial." Maj. Op. at 14. This incorrect recitation of the law is no more than a naked attempt to unfairly encumber defendants with a more difficult burden on plain error review.

When analyzed using the correct legal standard, the facts of this case clearly support a finding that Ushery's substantial rights were affected. Ushery had twice pleaded not guilty and refused to accept the government's plea offer by the time that this third hearing, the rearraignment, had occurred. The hearing itself was agreed to by district judge explicitly for the purpose of "discuss[ing] the potential of . . . [Ushery] enter[ing] a plea of guilty." (R. 61, Hr., p. 2). Resetting the trial date, the district judge reasoned, was in Ushery's "best interest;" after all, defense counsel had just announced, with respect to the guilty plea, that he could "get it resolved." (R. 19, Min. Ent.); (R. 60, Tel. Conf. Tr., p. 6). Defense counsel, however, did not get it resolved. The date of the hearing arrived, and Ushery was still not prepared to consent to the government's proposed plea agreement. That was Ushery's response even after the district judge had informed him that he had reached the "drop-dead date" for pleading guilty. (R. 61, Hr., p. 2). Ushery indicated that he felt pressured, but the district judge again, later in the proceedings, reminded him that "today is the last date that I am going to permit you to plead guilty if you want to . . . receive that third point for acceptance of responsibility." (*Id.* at 7). It was not until after the impermissible negotiations took place that Ushery finally indicated some openness to accepting the proposed plea agreement. But when the plea agreement was purportedly finalized, Ushery again expressed his reluctance to pleading guilty. Instead of accepting the agreement, he suggested that he had not had enough time to discuss his pleading options with his new attorney and that he remained uncomfortable with the agreement, given the length of the proposed sentence. The district judge responded, first by asking rhetorically whether additional time would be more or less helpful to Ushery, and then by explaining to Ushery the nature of his Hobson's choice. With no meaningful support or assistance even from his own attorney, it was only at this point that Ushery consented to the government's proposed plea agreement. Notably, the agreement was only slightly different from the one he had flat out rejected at the beginning of the proceedings. There is no fair reading of these facts that suggests

Ushery would have accepted this plea absent the district judge's participation in the plea negotiations.

"Rule 11(c)(1) was adopted as a prophylactic measure." *Davila I*, 133 S. Ct. at 2149. It establishes a "bright line rule," *United States v. Pena*, 720 F.3d 561 (5th Cir. 2013), and whether the judge's participation is aimed at helping the defendant is entirely irrelevant. *United States v. Harrell*, 751 F.3d 1235, 1239 (11th Cir. 2014). Under no circumstances may the court suggest terms to be negotiated or serve as the mediator in the course of negotiations, as was the case here. The district court had two options in this situation: to either accept or reject an agreement that the parties had entered into *or* to permit the case to proceed to trial. If the parties failed to enter into an agreement, a trial would appropriately ensue. Whether a trial was in Ushery's best interest is not a subject for appellate review under these circumstances. *Dominguez Benitez*, 542 U.S. at 85 ("[I]f it is reasonably probable he would have gone to trial absent the error, it is no matter that the choice may have been foolish."). The role of this Court is to judge whether there is a reasonable probability that Ushery would not have accepted the plea when he did but for the judicial interference. The record, even as laid out in the majority opinion, clearly indicates that Ushery would not have entered into the plea agreement, absent the Rule 11 violation. Therefore, the guilty plea and sentence should be vacated and the case remanded to the district court where Ushery can either enter a plea, absent judicial interference, or proceed to trial.